797 F.2d 1279
 RICO Bus.Disp.Guide 6338
 John HUTCHINSON; William Reese; Leonard Underwood, Appellants,
v.
Margaret D. MILLER, individually and as Clerk of the County
Commission of Kanawha County, West Virginia; David Michael
Staton; Steven L. Miller; James E. Roark, individually and
as Prosecuting Attorney of Kanawha County, West Virginia;
John A. Cavacini, Jr.; Computer Elections Systems, Inc., a
foreign corporation; Bernard H. Meadows; Clayton Spangler;
Keith Ervin Long; Carl Clough; William E. Biebel;
Darlene Dotson; Carolyn Critchfield, individually and as
Voter Registrar of Kanawha County, West Virginia; Ann
Carroll, individually and as Chief Deputy of the County
Commission of Kanawha County, West Virginia, Appellees,
and
Cherrie Lloyd, Defendant.
 No. 85-1548.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 3, 1986.
Decided Aug. 7, 1986.
 
 John E. Sutter (Ashcraft & Gerel, Baltimore, Md., on brief), and John R. Mitchell for appellants.
 John F. Wood, Jr., for appellees Margaret D. Miller and Steven L. Miller.
 Henry R. Glass, III (Chester Lovett, Lovett & Cooper, Charleston, W. Va., on brief), for appellee John A. Cavacini, Jr.
 Larry A. Winter (David D. Johnson, III, Spilman, Thomas, Battle & Klostermeyer, Charleston, W. Va., on brief), for appellees Computer Election Systems, Inc., Irvine Keith Long, Cherrie Lloyd, Carl Clough and William Biebel.
 W.E. Mohler, Charleston, W. Va., on brief, for appellee David M. Staton.
 James B. McIntyre, Charleston, W. Va., on brief, for appellee James E. Roark.
 Jack W. DeBolt, Charleston, W. Va., on brief, for appellee Bernard Meadows.
 Michael R. Cline, Charleston, W. Va., on brief, for appellees Clayton Spangler, Darlene Dotson, Carolyn Critchfield and Anne Carroll.
 Before PHILLIPS and WILKINSON, Circuit Judges, and GORDON, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.
 WILKINSON, Circuit Judge:
 
 
 1
 Plaintiffs are three unsuccessful candidates for public office who seek to recover approximately $9 million in damages under 42 U.S.C. Sec. 1983, 18 U.S.C. Sec. 1964 (Racketeer Influenced and Corrupt Organizations Act--RICO), and the common law of West Virginia, for alleged irregularities in the 1980 general election. The district court granted motions to dismiss, summary judgment, or directed verdicts in favor of all defendants, various election officials and those alleged to have conspired with them to fix the election. The court found plaintiffs had failed to prove the existence of a conspiracy, on which their case depended, or to show a fundamentally unfair election amounting to a constitutional deprivation.
 
 
 2
 We conclude that federal courts are not available for awards of damages to defeated candidates. Requests for equitable intervention into factual disputes over the conduct of elections, which raise many of the same concerns as those presented by this damages action, are unavailing save in rare and extraordinary circumstances. We need not consider, however, whether the present case presents such circumstances, for plaintiffs seek no equitable relief. Because we are convinced that damages are unavailable in any event, we affirm the district court's dismissal of this action.
 
 
 3
 Our constitution does not contemplate that the federal judiciary routinely will pass judgment on particular elections for federal, state or local office. The conduct of elections is instead a matter committed primarily to the control of states, and legislative bodies are traditionally the final judges of their own membership. The legitimacy of democratic politics would be compromised if the results of elections were regularly to be rehashed in federal court. Federal courts, of course, have actively guarded the electoral process from class-based discrimination and restrictive state election laws. This suit, however, asks us to consider the award of damages for election irregularities that neither disenfranchised a class of voters nor impugned state and federal procedures for the proper conduct of elections. In this essentially factual dispute, we defer to those primarily responsible for elections and we refuse to authorize yet another avenue for those disgruntled with the political process to keep the contest alive in the courtroom.
 
 I.
 
 4
 Plaintiffs were Democratic candidates in the 1980 general election in West Virginia. John Hutchinson sought re-election to the United States House of Representatives in the Third Congressional District of West Virginia. This district included Kanawha and Boone Counties--where the disputed elections occurred--as well as twelve other counties. Plaintiff Leonard Underwood was the incumbent delegate to the state house from Kanawha County, and plaintiff William Reese sought election as a County Commissioner for Kanawha County. Hutchinson and Reese were defeated by wide margins, while Underwood's loss was a narrow one.
 
 
 5
 Underwood requested a recount of all computer punchcard ballots cast in the election. When the Kanawha County Commission denied this request, Underwood sought a writ of mandamus in the Circuit Court of Kanawha County to compel a hand count of ballots. That action was dismissed, and a similar attempt before the state Supreme Court was found to be time barred. State ex rel. Underwood v. Silverstein, 278 S.E.2d 886 (W.Va.1981). Hutchinson filed a formal election complaint with the United States Attorney in January, 1981. The resolution of that complaint is not revealed in the record, but apparently was not satisfactory to Hutchinson. Plaintiffs filed their original complaint in this suit in February, 1983.
 
 
 6
 As amended, the complaint in essence charges that the election night totals were pre-determined by defendants, who then conspired to cover up their activities. Named as defendants in the suit were both local officials and private citizens alleged to have acted in concert with those officials. The officials included Margaret Miller, Clerk of the County Commission of Kanawha County; Carolyn Critchfield, Ann Carroll, Darlene Dotson and Clayton Spangler, employees in the clerk's office; James Roark, the Prosecuting Attorney of Kanawha County in 1980; and Bernard Meadows, employed by the Clerk of the County Commission of Boone County. Private citizens named as defendants included Steven Miller, husband of Margaret Miller; David Staton, the successful Congressional candidate in the 1980 election; and John Cavacini, who in 1980 was associated with the campaign of Governor John D. Rockefeller, IV. Finally, plaintiffs sued Computer Election Systems, Inc. (CES), which provided computer vote tabulating systems in Kanawha County, and four employees of CES--Keith Long, Carl Clough, Cherrie Lloyd, and William Biebel.
 
 
 7
 Plaintiffs allege that a conspiracy among the defendants began as early as January, 1979, when Kanawha County Commissioners considered the use of electronic voting equipment. They suggest that the Millers' support for the CES system and their role in the bidding process reveals the genesis of a scheme to fix the 1980 election. This purported scheme continued as CES employees helped county officials prepare for the use of CES equipment in the November election. Defendants, by contrast, describe the selection and preparation of CES equipment as legitimate and lawful activity designed to assist them in the efficient conduct of the election.
 
 
 8
 The CES system provided the county with electronic punch card vote tabulation, in which voters indicated their choices on computer punch cards. After polls were closed, these cards were transported to countywide tabulation centers in locked and sealed ballot boxes. The ballots were removed by teams of workers, who arranged them for feeding into the computer and noted in log books the time when ballot boxes were opened. Plaintiffs cite as evidence of election fraud the fact that the log shows one box was opened after the computer tabulation was printed out.
 
 
 9
 Plaintiffs' main allegations focus on events at the central tabulation center for Kanawha County. They rely largely on the testimony of Walter Price, incumbent candidate for the House of Delegates who was at the center on election night. Price testified that he observed Margaret Miller manipulating computer toggle switches during the election count, purportedly in an attempt to alter vote counts. He saw an "unknown gentleman"--whom plaintiffs identify as Carl Clough--placing a phone receiver into his briefcase. Plaintiffs suggest that this activity is consistent with the use of a portable modem, perhaps in an effort to change vote totals. Price also testified that Stephen Miller took computer cards from his coat pocket and gave them to his wife, who allegedly fed the cards into the computer.
 
 
 10
 Finally, plaintiffs assert that numerous irregularities occurred after the election, including improper handling of the ballots and release of exact returns prior to the canvass, and destruction of ballots that violated the terms of W.Va. Code Sec. 3-6-9. Plaintiffs make similar, though less detailed, allegations with respect to the election process in Boone County.
 
 
 11
 The district court made numerous rulings that narrowed the scope of this litigation. After ordering a complaint with more detailed allegations, the court found the amended complaint barely adequate to survive a motion to dismiss, except as to defendant Lloyd.[1] The court also held that plaintiffs' action came within the two-year limitations period because it alleged a conspiracy with wrongful acts as late as February 8, 1981. This holding, however, limited plaintiffs' case to the conspiracy and removed individual acts of defendants from the litigation.
 
 
 12
 After discovery, the court granted summary judgment in favor of defendant Cavacini, alleged to have had possession of unauthorized election returns. It also found the allegations of a Boone County conspiracy to be time barred, and accordingly granted summary judgment as to defendants Beibel and Meadows.[2]
 
 
 13
 The court considered motions for directed verdicts at the close of plaintiffs' case. It found that plaintiffs' claims failed for several reasons. The court held that plaintiffs had failed to prove a conspiracy, noting that the only evidence the election was rigged was "purely speculative ... mere suspicion." It also found that plaintiffs Reese and Hutchinson had not shown that they were harmed by the alleged actions; there was no evidence that their large losses would have been victories in the absence of the alleged conspiracy. Further, finding only "mere election irregularities" and no evidence to suggest that the election was fundamentally unfair, the court held that plaintiffs had failed to prove a deprivation of a constitutional right essential to a Sec. 1983 action. Finally, the court dismissed plaintiffs' claims under RICO, finding "absolutely no proof" that would allow it to consider the claim.
 
 II.
 
 14
 Though our disposition of this dispute rests on the view that damages are unavailable to defeated candidates as a method of post-election relief, we are guided by an awareness of the broader context in which this suit arises. The plaintiffs ask us to arbitrate what is essentially a political dispute over the results of an election. We find it useful, for proper understanding of this case, to discuss the structural characteristics and mechanisms for review of disputed elections. This examination reveals both the proper sphere and the limits of judicial oversight of controversies in the electoral process.
 
 
 15
 As in any suit under Sec. 1983 the first inquiry is "whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.' " Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979).[3] In their complaint, plaintiffs alleged that defendants deprived them of "their constitutionally protected right to participate fully and fairly in the electoral process," and "their constitutional right to vote or receive votes," and their Fifth Amendment right to hold property, in this case public office. The district court found that plaintiffs proceeded at trial as "defeated or disenfranchised candidate[s] rather than as ... disenfranchised voter[s]." Thus, plaintiffs essentially assert that they have been deprived of their "right to candidacy."
 
 
 16
 Courts have recognized that some restrictions on political candidates violate the Constitution because of their derivative effect on the right to vote. See, e.g., Anderson v. Celebrezze, 460 U.S. 780, 786-88, 103 S.Ct. 1564, 1568-69, 75 L.Ed.2d 547 (1983); Clements v. Fashing, 457 U.S. 957, 962-64, 102 S.Ct. 2836, 2843-44, 73 L.Ed.2d 508 (1982); Bullock v. Carter, 405 U.S. 134, 142-44, 92 S.Ct. 849, 855-56, 31 L.Ed.2d 92 (1972); cf., Snowden v. Hughes, 321 U.S. 1, 7, 64 S.Ct. 397, 400, 88 L.Ed. 497 (1944). We assume, without deciding, that plaintiffs have sufficiently alleged a deprivation of constitutional rights to meet the basic requirements of a Sec. 1983 cause of action. That assumption, however, cannot end the matter. As Judge Rubin has noted for the Fifth Circuit: "constitutional decision must not be confined merely to the logical development of the philosophy of prior decisions unfettered by other considerations. The functional structure embodied in the Constitution, the nature of the federal court system, and the limitations inherent in the concepts both of limited federal jurisdiction and of the remedy afforded by section 1983 must all be fully attended." Gamza v. Aguirre, 619 F.2d 449, 452 (5th Cir.1980). The functional allocations and structural mandates of our Constitution lead us to conclude, like the court in Gamza, that this complaint must be dismissed.
 
 
 17
 We first acknowledge and affirm the significant duty of federal courts to preserve constitutional rights in the electoral process. Our role, however, primarily addresses the general application of laws and procedures, not the particulars of election disputes. Federal courts have, for example, invalidated class-based restrictions of the right to vote. See, e.g., Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (durational residence requirement); Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (poll tax); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (restriction on voting rights of servicemen); Bell v. Southwell, 376 F.2d 659 (5th Cir.1967). The dilution of votes through malapportionment has also been a major concern of the federal judiciary. See, e.g., Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Courts have also acted to further the congressional mandate, as expressed in the Voting Rights Act, 42 U.S.C. Sec. 1973 et seq., that race shall not affect the right to vote. See, e.g., Rome v. United States, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980); Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971). Intervention for reasons other than racial discrimination "has tended, for the most part, to be limited to striking down state laws or rules of general application which improperly restrict or constrict the franchise" or otherwise burden the exercise of political rights. Griffin v. Burns, 570 F.2d 1065, 1076 (1st Cir.1978). See, e.g., Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); Hendon v. North Carolina State Board of Elections, 710 F.2d 177 (4th Cir.1983). By these means, federal courts have assumed an active role in protecting against dilution of the fundamental right to vote and the denial of this right through class disenfranchisement.
 
 
 18
 By contrast, "[c]ircuit courts have uniformly declined to endorse action under Sec. 1983 with respect to garden variety election irregularities." Griffin v. Burns, 570 F.2d at 1076. See, e.g., Welch v. McKenzie, 765 F.2d 1311 (5th Cir.1985); Gamza v. Aguirre, 619 F.2d 449 (5th Cir.1980); Hennings v. Grafton, 523 F.2d 861 (7th Cir.1975); Pettengill v. Putnam County R-1 School District, 472 F.2d 121 (8th Cir.1973); Powell v. Power, 436 F.2d 84 (2d Cir.1970). These courts, mainly considering disputes involving state elections, have declined to interfere because of the constitutional recognition that "states are primarily responsible for their own elections," Welch, 765 F.2d at 1317, and that alternative remedies are adequate to guarantee the integrity of the democratic process. See, e.g., Powell, 436 F.2d at 88. The discussion of those alternative means of resolving electoral disputes is the focus of the following section.
 
 III.
 
 19
 We note initially that the constitution anticipates that the electoral process is to be largely controlled by the states and reviewed by the legislature. This control reaches elections for federal and state office. Article I, sec. 4, cl. 1, grants to the states the power to prescribe, subject to Congressional preemption, the "Times, Places and Manner of holding Elections for Senators and Representatives." In addition, states undoubtedly retain primary authority "to regulate the elections of their own officials." Oregon v. Mitchell, 400 U.S. 112, 125, 91 S.Ct. 260, 265, 27 L.Ed.2d 272 (1970) (opinion of Black, J.).
 
 
 20
 Where state procedures produce contested results, the Constitution dictates that, for congressional elections, "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." Art. I, Sec. 5, cl. 1. The House accordingly has the authority "to determine the facts and apply the appropriate rules of law, and, finally, to render a judgment which is beyond the authority of any other tribunal to review." Barry v. United States ex rel. Cunningham, 279 U.S. 597, 613, 49 S.Ct. 452, 455, 73 L.Ed. 867 (1929). See also Roudebush v. Hartke, 405 U.S. 15, 19, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972); McIntyre v. Fallahay, 766 F.2d 1078 (7th Cir.1985). This plenary power is paralleled at the state level by the power of the West Virginia legislature to review the elections of its own members. See generally, W. Va. Code Secs. 3-7-4,5. Contests for county offices, such as that of plaintiff Reese, are resolved by county courts. W.Va.Code Sec. 3-7-6.
 
 
 21
 We thus proceed with awareness that the resolution of particular electoral disputes has been primarily committed to others in our system. The express delegation to Congress and the states of shared responsibility for the legitimation of electoral outcomes and the omission of any constitutional mandate for federal judicial intervention suggests the inadvisability of permitting a Sec. 1983 or civil RICO action to confer upon federal judges and juries "a piece of the political action," no matter what relief is sought. Consideration of the various ways in which these other bodies have regulated and monitored the integrity of elections only confirms our hesitation to consider the disputed details of political contests.
 
 
 22
 Those with primary responsibility have not abandoned their duty to ensure the reliability and fairness of democratic elections. The House of Representatives, for example, has developed a body of guiding precedent regarding election contests, see 2 Deschler's Precedents of the United States House of Representatives, 323-888 (1977), and has enacted detailed procedures designed to ensure due process and just consideration of disputes. See Federal Contested Elections Act, 2 U.S.C. Secs. 381-396. The operation of these procedures was illustrated recently in the review of a close election contest for the House of Representatives in Indiana. See generally H.R.Rep. No. 58, 99th Cong., 1st Sess. (1985). The partisan and acrimonious nature of that debate only reaffirms the wisdom of avoiding judicial embroilment and of leaving disputed political outcomes to the legislative branch. See McIntyre v. Fallahay, 766 F.2d 1078 (7th Cir.1985). Had the framers wished the federal judiciary to umpire election contests, they could have so provided. Instead, they reposed primary trust in popular representatives and in political correctives.
 
 
 23
 Dissatisfied candidates for office in West Virginia are also presented with numerous avenues by which to challenge election results, some of which parallel the federal model. The legislature is directed by Art. 4, Sec. 11 of the West Virginia Constitution "to prescribe the manner of conducting and making returns of elections, and of determining contested elections ... ," and has accordingly enacted procedures for ballot control and recounts, W.Va. Code Secs. 3-6-6 to 3-6-9 and election contests, W.Va.Code Secs. 3-7-1 to 3-7-9. Initially, of course, the election returns are counted and certified by a board of canvassers. W.Va.Code Sec. 3-6-9. West Virginia courts have long exercised "election mandamus" powers by which they may "compel any [election] officer ... to do and perform legally any duty herein required of him." W.Va.Code Sec. 3-1-45. See, White v. Manchin, 318 S.E.2d 470 (W.Va.1984); State ex rel. Booth v. Board of Ballot Commissioners, 156 W.Va. 657, 196 S.E.2d 299 (1972); Marquis v. Thompson, 155 S.E. 462, 109 W.Va. 504 (1930). Appellant Underwood, in fact, attempted to employ this very procedure to compel a recount, but his writ was denied as untimely. State ex rel. Underwood v. Silverstein, 278 S.E.2d 886.
 
 
 24
 State and federal legislatures, moreover, are not concerned solely with election results, but have subjected the entire electoral process to increasing regulation. Congress has enacted complex and comprehensive statutes to regulate campaign financing, 2 U.S.C. Secs. 431-441j in an effort to "protect the integrity of the political process," California Medical Association v. FEC, 641 F.2d 619 (9th Cir.1980) (en banc), aff'd, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) and to prevent "corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions...." Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976) (per curiam). This system of regulation includes not only substantive constraints on campaign financing, see, e.g., 2 U.S.C. Sec. 441a, but also procedural mechanisms and an administrative body, the Federal Election Commission, responsible for implementing and enforcing federal election laws. See, 2 U.S.C. Secs. 437c-438. West Virginia has likewise enacted legislation designed to control "[p]olitical campaign contributions, receipts and expenditures of money, advertising, influence and control of employees, and other economic, political and social control factors incident to ... elections." W.Va.Code Sec. 3-8-1. See W.Va. Code Secs. 3-8-1 to 3-8-13. Thus it seems fair to conclude that the demonstration of judicial restraint under 42 U.S.C. Sec. 1983 will not leave American elections unsupervised or unregulated.
 
 
 25
 Finally, both state and federal authorities have employed criminal penalties to halt direct intrusions on the election itself. Federal conspiracy laws such as 18 U.S.C. Sec. 241 have been applied to those engaged in corruption of election procedures. See also, 18 U.S.C. Sec. 594 (prohibiting intimidation of voters); 18 U.S.C. Sec. 600 (prohibiting promise of employment or other benefit for political activity). Criminal sanctions are also available under West Virginia law for those found to have filed false returns, tampered with ballots, bought or sold votes, and the like. See, W.Va. Code Secs. 3-9-1 to 3-9-24. A state grand jury investigated the very allegations at issue here, and issued one indictment, which did not result in a conviction.
 
 IV.
 
 26
 Though the presence of even exhaustive alternative remedies does not usually bar an action literally within Sec. 1983 or other statutes, Patsy v. Board of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 481, 5 L.Ed.2d 492 (1961), we are persuaded in this context that we must refrain from considering the particulars of a disputed election, especially in a suit for damages. To do otherwise would be to intrude on the role of the states and the Congress, to raise the possibility of inconsistent judgments concerning elections, to erode the finality of results, to give candidates incentives to bypass the procedures already established, to involve federal courts in the details of state-run elections, and to constitute the jury as well as the electorate as an arbiter of political outcomes. These costs, we believe, would come with very little benefit to the rights fundamentally at issue here--the rights of voters to fair exercise of their franchise. Instead, plaintiffs, who voluntarily entered the political fray, would stand to reap a post-election recovery that might salve feelings of rejection at the polls or help retire debts from the campaign but would bear very little relationship to the larger public interest in partisan debate and competition undeterred by prospects of a post-election suit for damages.
 
 
 27
 Plaintiffs' theories in this case illustrate the ways in which a lawsuit such as this could intrude on the role of states and Congress to conduct elections and adjudge results. In their complaint, plaintiffs allege damages including, inter alia, loss of income (salary from holding public office), earning capacity, time expended for election purposes and various election expenses, as well as injury to reputation. These losses, of course, would have resulted from election defeat absent any conspiracy by defendants. Injury to reputation, for example, may inhere in any political loss where exposure of opposition blemishes has from the earliest days of the Republic been a part of the quest for public office. Loss of the public official's salary is, ipso facto, an element of each and every political defeat.
 
 
 28
 Thus, plaintiffs in order to recover damages must perforce rely on the theory that defendants' alleged conspiracy cost them an election they otherwise would have won. In presenting their case plaintiffs would essentially ask a jury to review the outcome of the election. As explained above, however, the task is reserved for states and legislatures, and though the jury's review would not directly impair their primary responsibility to adjudge elections, its re-examination of election results would be inconsistent with proper respect for the role of others whose job it is to canvass the returns and declare a prevailing party. This intrusion, moreover, would not be limited to that of a jury, for the judiciary itself would doubtless be asked to review the jury's judgment of the election in post-trial motions. Principles of separation of powers and federalism, therefore, dictate that both jury and court avoid this inquiry.
 
 
 29
 Just as the review of electoral results by judge or jury is inconsistent with proper respect for the role of states and Congress, so too the outcomes of these deliberations are potentially inconsistent with the results of the electoral process. Were plaintiffs successful in convincing the jury that they should have won the election or should receive an award of damages, the courts would enter a judgment at odds with the judgment of Congress and of West Virginia, which have seated the apparent victors in these elections. The difficulties inherent in such continuing assaults on political legitimacy would be obvious and might impair the respect to which the enactments of those duly elected are entitled.
 
 
 30
 Closely related to the problem of inconsistent judgments is the need for finality in elections. Inconsistent judgments, of course, call into question the results of an election in a way that detracts from finality. Even without inconsistent judgments, suits asking federal courts to replay elections cast into limbo contests that should have been long since decided. This case is illustrative. The election at issue occurred in 1980. Plaintiffs did not even bring their suit until 1983, after plaintiff Hutchinson's term would have expired. Now, nearly six years after the election, the parties remain in court essentially to contest the integrity of the election. So long as such avenues are available to defeated candidates, the apparent finality of election outcomes will be illusory.
 
 
 31
 Maintenance of this action might also provide incentives to losing candidates to ignore the principal routes established to challenge an election and to proceed instead to have the election reviewed in federal courts in hopes of gaining monetary compensation. Plaintiffs in this case, for example, made incomplete use of state and federal procedures yet still seek to recover millions of dollars in this action. Underwood pursued his efforts to secure a recount in an untimely fashion; though Hutchinson filed a complaint with the United States Attorney, there is no evidence that he pursued other avenues available to contest the election; Reese apparently made no attempts to employ available procedures. To allow these plaintiffs access to the federal courts would undermine the processes that are intended to serve as the primary routes to election control: "federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a section 1983 gloss." Gamza v. Aguirre, 619 F.2d 449 (5th Cir.1980).
 
 
 32
 We further believe that federal courts are ill-equipped to monitor the details of elections and resolve factual disputes born of the political process. As one court has noted, "[w]ere we to embrace plaintiffs' theory, this court would henceforth be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, election cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law." Powell v. Power, 436 F.2d 84, 86 (2d Cir.1970). Elections are, regrettably, not always free from error. Voting machines malfunction, registrars fail to follow instructions, absentee ballots are improperly administered, poll workers become over-zealous, and defeated candidates are, perhaps understandably, inclined to view these multifarious avu@ c @a] b . apart from the serious problems of federalism and separation of powers problems raised by these tasks, we find sifting the minutae of post-election accusations better suited to the factual review at the administrative and legislative level, where an awareness of the vagaries of politics informs the judgment of those called upon to review the irregularities that are inevitable in elections staffed largely by volunteers. See Hennings v. Grafton, 523 F.2d 861, 865 (7th Cir.1975).
 
 
 33
 To ask a jury to undertake such tasks, moreover, is to risk the intrusion of political partisanship into the courtroom, where it has no place. From the exercise of jury strikes to the final rendering of verdict, the spectre of partisanship would intrude and color court proceedings. Such disputes belong, and have been placed, in the political arena, and we cannot accept the substitution of the civil jury for the larger, more diverse, and more representative political electorate that goes to the polls on the day of the election.
 
 
 34
 These concerns suggest that the federal judiciary should proceed with great caution when asked to consider disputed elections, and have caused many courts to decline the requests to intervene except in extraordinary circumstances. The unique nature of this case convinces us that the requested intervention is inappropriate under any circumstances, for plaintiffs' suit for damages strikes us as an inapt means of overseeing the political process. It would provide not so much a correction of electoral ills as a potential windfall to plaintiffs and political advantage through publicity. See McIntyre v. Fallahay, 766 F.2d at 1087. Those who enter the political fray know the potential risks of their enterprise. If they are defeated by trickery or fraud, they can and should expect the established mechanisms of review--both civil and criminal--to address their grievances, and to take action to insure legitimate electoral results. In this way, they advance the fundamental goal of the electoral process--to determine the will of the people--while also protecting their own interest in the electoral result. A suit for damages, by contrast, may result principally in financial gain for the candidate. We can imagine no scenario in which this gain is the appropriate result of the decision to pursue elected office, and we can find no other case in which a defeated candidate has won such compensation. Nor do we believe, in light of the multitude of alternative remedies, that such a remedy is necessary either to deter misconduct or to provide incentives for enforcement of election laws.
 
 V.
 
 35
 We accordingly hold that federal courts do not sit to award post-election damages to defeated candidates. Equitable relief, though theoretically available, has properly been called a "[d]rastic, if not staggering" intrusion of the federal courts, and "therefore a form of relief guardedly exercised." Bell v. Southwell, 376 F.2d at 662. Courts have therefore repeatedly refused to intervene in routine election disputes, acting instead only in instances of "patent and fundamental unfairness" that "erode[] the democratic process." Hendon, 710 F.2d at 182. Thus, in Ury v. Santee, 303 F.Supp. 119, 124 (N.D.Ill.1969), the court invalidated an election in which "hundreds of voters were effectively deprived of their right to vote" when drastic reduction in the number of precincts rendered polling places so crowded as to be inaccessable. See also Smith v. Cherry, 489 F.2d 1098, 1102 (7th Cir.1973), cert. denied, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974) (offering of sham candidate "clearly debased the rights of all voters in the election").
 
 
 36
 In short, the general attitude of courts asked to consider election disputes, whatever the relief sought, has been one of great caution. Intervention has come only in rare and extraordinary circumstances, for courts have recognized and respected the delegation of such disputes to other authorities. Such intervention, moreover, has never included the grant to defeated candidates of monetary compensation. Because such compensation is fundamentally inappropriate, we hold that it is unavailable as a form of post-election relief. The parties here have asked for nothing more, and we need not consider under what circumstances equitable remedies might be appropriate. Accordingly, the judgment of the district court dismissing this lawsuit is hereby
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 Lloyd asserts that plaintiffs' appeal of her dismissal is not timely under Fed.R.App.P. 4. This contention is incorrect. Under Fed.R.Civ.P. 54(b), a ruling adjudicating "fewer than all the claims or the rights and liabilities of fewer than all the parties" is not final absent "express determination that there is no just reason for delay and ... an express direction for the entry of judgment." The court here made no such determination, and therefore the timeliness of the appeal as to defendant Lloyd is measured by the date of entry of final judgment resolving all issues as to all parties. See, Robinson v. Parke-Davis & Co., 685 F.2d 912 (4th Cir.1982)
 
 
 [2]
 Plaintiffs appeal the dismissal of Lloyd and the summary judgment in favor of Biebel, Meadows and Cavacino as improperly granted. Because we hold that this action may not be maintained under any circumstances, we need not consider the specific issues raised by these judgments
 
 
 [3]
 Though we speak here in terms of Sec. 1983, our discussion applies as well to the RICO and common law counts. Our review of the limited role of federal courts does not depend on the specific theory under which a particular suit is brought, but rather upon the institutional structure established by the constitution and administered through other state and federal remedies