**Gary E. HINDES, Plaintiff,**

v.

**Michael N. CASTLE, Friends of Mike Castle, Dale E. Wolf, Committee to Elect Dale Wolf, William E. Manning, Bruce E. Winn, Carl Hostetter, John G. Sargent and Michael E. Harkins, Defendants.**

**Civ. A. No. 89–564 LON.**

United States District Court, D. Delaware.

June 26, 1990.

Joseph A. Rosenthal of Morris, Rosenthal, Monhait & Gross, Wilmington, Del. (James F. Hibey (argued), Berl Bernhard, Richard H. Saltsman, Frances C. DeLaurentis, Lewis B. Gardner and John B. Britton, of Verner, Liipfert, Bernhard, McPherson & Hand, Washington, D.C., of counsel), for plaintiff.

E. Norman Veasey (argued), R. Franklin Balotti, John A. Parkins, Jr., David C. Johnson–Glebe, Robert Kriner, Jr. and David L. Zicherman of Richards, Layton & Finger, Wilmington, Del., for defendants.

## OPINION

LONGOBARDI, Chief Judge.

This case arises out of the 1988 elections for Governor and Lieutenant Governor of the State of Delaware. Gary E. Hindes ("Hindes"), the Democratic candidate for Lieutenant Governor, contends that Governor Michael N. Castle ("Castle"), Lieutenant Governor Dale E. Wolf ("Wolf") and their respective campaign committees violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, by soliciting money for Castle's campaign under false and fraudulent pretenses and then illegally contributing a portion of that money to Wolf's election committee in violation of the Delaware Campaign Financing and Disclosure Act, 15 Del.C. § 8001, *et seq.*[1]

Presently before the Court is the Defendants' motion to dismiss. Defendants contend that the complaint should be dismissed because: (1) Plaintiff has failed to allege a pattern of racketeering activity necessary for a valid RICO claim; (2) Plaintiff lacks standing to bring the RICO claim; (3) Principles of federalism preclude the intervention of the federal court into state election practices; and (4) Plaintiff is unable to demonstrate that Castle's contributions to Wolf's campaign violated Delaware law.[2]

## I. FACTS[3]

In January of 1988, Michael N. Castle, Governor of Delaware, announced his intention to seek a second term in the upcoming 1988 elections. Pursuant to this decision, Castle utilized an organization created prior to 1988 called Friends of Mike Castle (the "Castle Committee") to solicit contributions and make expenditures in support of his candidacy. Defendant Carl Hostetter was the treasurer of the Castle Committee and Defendant Michael Harkins served as an advisor.

---

1. In the Plaintiff's original Complaint, Docket Item ("D.I.") 1, Defendants were also alleged to have violated the Delaware RICO statute, 11 Del.C. § 1501, *et seq.* Plaintiff subsequently filed a First Amended Complaint, D.I. 12, which alleges only causes of action under the federal RICO statute.

2. Because the Defendants filed their opening brief for their motion to dismiss prior to the Defendants' First Amended Complaint, the Defendants further contend that the Plaintiff's Delaware RICO claim should be dismissed. In light of the Plaintiff's First Amended Complaint, this point is moot.

3. For the purposes of the present motion to dismiss, the Court has accepted as true the First Amended Complaint's well-pleaded factual allegations, drawing all reasonable inferences in favor of the Plaintiff. *Mortensen v. First Federal Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3rd Cir.1977); *see also Angelastro v. Prudential–Bache Securities,* 764 F.2d 939 (3rd Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985).

Dale Wolf, presently the Lieutenant Governor of Delaware, announced on February 3, 1988, his plan to run as the Republican candidate for Lieutenant Governor. At that point, Wolf had spent most of his career as an executive for the DuPont Company and was relatively unknown politically. Three days after Wolf announced his candidacy, he formed the Committee to Elect Dale Wolf (the "Wolf Committee") for the purposes of soliciting contributions and making campaign expenditures. Defendant John Sargent was the treasurer of the Wolf Committee.

On March 30, 1988, Plaintiff Hindes, a Democrat, announced his decision to challenge Wolf for the office of Lieutenant Governor.

Although under Delaware law the Governor and the Lieutenant Governor do not run as a unified "ticket" and are elected in separate and independent elections, in April of 1988 Castle and Wolf decided to run a joint campaign under the slogan "Castle and Wolf—Delaware's Winning Partnership." As a result of the joint campaign decision, Defendant William Manning was hired as campaign chairman for both campaigns and Defendant Bruce Winn served as campaign manager for both campaigns.

In a mass mailing in February of 1988, the Castle Committee solicited contributions to the Castle campaign. Thank you notes were subsequently sent by Castle to those who contributed to the campaign. In July of 1988, after Castle and Wolf made the decision to run a joint campaign, they sent out an additional group of letters soliciting contributions. The majority of this mailing was devoted to Wolf's campaign. Although the letters were sent jointly, they expressly instructed contributors to make checks payable to either the Castle Committee or the Wolf Committee depending upon which candidate they wished to support. Contributors were also reminded that they could support both candidates by writing two separate checks.

Despite the alleged implicit representation made in the solicitations that money contributed to one candidate would be used exclusively for that candidate's campaign, the Castle Committee paid a disproportionate share of the joint expenses of the Castle and Wolf Committees. The Castle Committee also paid a portion of some expenses attributable solely to the Wolf campaign.

Plaintiff alleges that the Castle Committee's disproportionate payment of joint expenses was fraudulent in light of the alleged implicit representation that contributions made to one candidate would be spent on that candidate's campaign. The Plaintiff further contends that the Defendants intended to effectuate this fraudulent scheme from the time Wolf announced his candidacy in early February.

Finally, Plaintiff alleges that the disproportionate payment of joint expenses amounted to campaign contributions to the Wolf campaign in excess of what was allowable under Delaware law.[4]

The total amount of money contributed by the Castle Committee to the Wolf Committee in the form of disproportionate contributions to joint expenses and outright payment of Wolf's expenses exceeded $350,000. In order to remain competitive in the Lieutenant Governor's race, the Plaintiff alleges he was forced to spend an additional $350,000 in campaign expenses.

## II. DISCUSSION

Although the Plaintiff does not assert either the fraudulent scheme or the violations of Delaware law as independent bases for liability, the Plaintiff does assert that all of the mailings associated with the solicitation and collection of campaign contributions to effectuate these ends constitute

---

**4.** At some point in the early summer of 1988, Plaintiff contacted Samuel Shipley, Democratic State Chairman and informed him of his concern that Castle and Wolf had violated Delaware law. Shipley then asked the State Election Commissioner, John Davis to investigate. The result of this request to investigate is unclear from the pleadings. Very recently, the State Attorney General issued an opinion which stated that the practices alleged by the Plaintiff were not in violation of Delaware state law.

predicate acts of mail fraud under the RICO statute.[5]

■ To survive a motion to dismiss a RICO claim, the plaintiff must sufficiently allege that the defendant (1) through the commission of two or more acts (2) constituting a "pattern" (3) of "racketeering activity" (4) directly or indirectly invested in or maintained an interest in, or participated in (5) an "enterprise" (6) the activities of which affect interstates commerce. *Elysian Fed. Sav. v. First Interregional Equity*, 713 F.Supp. 737, 753 (D.N.J.1989); *see also Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Further, the RICO statute requires that the plaintiff establish that he was "injured in his business or property *by reason of*" the racketeering activity. 18 U.S.C. § 1964(c) (emphasis added); *Sedima, S.P. R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

In the present case, Plaintiff alleges that in soliciting funds through the mail in furtherance of their fraudulent scheme to funnel money from the Castle campaign to the Wolf campaign, Defendants committed many acts of the racketeering activity of mail fraud. Plaintiff further contends that the series of mail frauds constituted a pattern of racketeering activity. The enterprise through which the Defendants conducted the racketeering activity was the Committee to Elect Dale Wolf. Finally, Plaintiff asserts that he was injured by the racketeering activity because it allowed Wolf to spend more on his campaign which, in turn, required the Plaintiff to spend more on his campaign.

## A. *The Pattern Requirement*

A significant body of jurisprudence has developed within recent years regarding the question of what constitutes a pattern of racketeering activity under the RICO statute. The statute itself is unclear, stating only that a pattern consists of two or more acts of racketeering activity within ten years. 18 U.S.C. § 1961(5). It is quite clear, however, that something more than simply two predicate acts is necessary to establish the existence of a pattern. *H.J. Inc. v. Northwestern Bell Telephone Co.,* — U.S. —, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Sedima,* 473 U.S. 479, 105 S.Ct. 3275.

The Supreme Court in *Sedima* attempted to establish a framework from which lower courts could develop a standard for the determination of a pattern in the RICO context. In *Sedima,* the court rejected the Second Circuit's position that predicate acts under RICO could only be based on offenses for which the defendant had been convicted. *Sedima,* 473 U.S. at 488–95, 105 S.Ct. at 3280–84. In so doing, the court also touched upon the issue of what constitutes a pattern. While declining to establish a specific test to be applied by lower courts, Justice White pointed to language in the legislative history of the act suggesting that a pattern of activity must exhibit "continuity plus relationship." *Id.* at 496 n. 14, 105 S.Ct. at 3285 n. 14. By focusing on these two concepts, lower courts could develop their own standards for determining the existence of a pattern of racketeering activity. *Id.*

Although *Sedima* attempted to provide a theoretical foundation for the pattern analysis, as a practical matter, the concept remained as vague and amorphous as it had been prior to *Sedima.* Evidence of this uncertainty can be seen in the wide range of approaches developed by Circuit Courts. *See Superior Oil Co. v. Fulmer,* 785 F.2d 252 (8th Cir.1986) (holding that a pattern of racketeering activity required multiple illegal schemes); *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350 (5th Cir.1985) (finding the allegation of two predicate acts alone was sufficient to estab-

---

5. Plaintiff vehemently contends that it is unnecessary for the Court to find that the transfer of funds from the Castle campaign to the Wolf campaign violates Delaware law in order for the Plaintiff to prevail on his RICO claim. Instead, the Plaintiff asserts that the fraudulent scheme underlying the mail fraud predicate acts which form the basis of the claim was the Defendants' violation of what the Plaintiff has termed is the only reasonable inference from the solicitations; that is, money donated to one candidate would be used exclusively for that candidate.

lish a pattern); *United States v. Watchmaker,* 761 F.2d 1459 (11th Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 880, 88 L.Ed.2d 917 (1986).

In response to the absence of any meaningful guidance from the Supreme Court on the issue, the Third Circuit developed its own multi-factor approach. In *Barticheck v. Fidelity Union Bank/First Nat. State,* 832 F.2d 36, 39 (3rd Cir.1987), the court stated that the pattern analysis "turns on a combination of the following factors: (1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity. *Id.* at 39.

In light of the conflicting standards among the Circuits, the Supreme Court recently revisited the issue in *H.J. Inc. v. Northwestern Bell Telephone Co.,* 109 S.Ct. at 2893. In *H.J. Inc.,* the plaintiffs alleged that between 1980 and 1986 Northwestern Bell made various cash and in-kind payments to the Minnesota Public Utilities Commissions ("MPUC") to influence them to approve rates for the company that were unfair and unreasonable. *Id.* The District Court dismissed the RICO claims because the plaintiff failed to allege a "pattern of racketeering activity." The District Court found that because "each of the fraudulent acts alleged ... was committed in furtherance of a single scheme to influence the MPUC commissioners", the plaintiff failed to establish the existence of multiple illegal schemes necessary to find a RICO pattern. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 648 F.Supp. 419, 425 (D.Minn.1986). The Court of Appeals for the Eighth Circuit affirmed the dismissal of plaintiff's RICO claims. 829 F.2d 648 (8th Cir.1987).

In reversing the Eighth Circuit's decision, the Supreme Court stated that the presence of multiple illegal schemes was not a prerequisite to the existence of a pattern of racketeering activity. *H.J. Inc.,* 109 S.Ct. at 2901. The Court reasserted that the necessary elements for a pattern of racketeering activity, in addition to two predicate acts within ten years, were relat-

edness and continuity of the predicate acts. "[The] plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amounted to or pose a threat of continued criminal activity." *Id.* at 2900 (emphasis original).

### 1. Relatedness of Predicate Acts

■ In its discussion of the relatedness requirement of the pattern element, the Supreme Court made reference to Title X of the Dangerous Special Offender Sentencing Act, 18 U.S.C. § 3575, *et seq.* That statute provides that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 2901. Relatedness of predicate acts for the purpose of establishing a pattern of racketeering activity under RICO should be measured against this standard. *Id.*

In the case at bar there is little question that the Plaintiff sufficiently pled the relatedness of the predicate acts. As alleged in the complaint, the purpose of each mailing was to raise money in furtherance of the fraudulent scheme to funnel money from Castle's campaign to Wolf's campaign. Not only does the complaint allege that the predicate acts had the same purpose but it also alleges that they were perpetrated by the same Defendants using the same methodology.

### 2. Continuity of the Predicate Acts

■ With respect to the continuity prong of the pattern analysis, the Court stated that "continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 2902, *citing Barticheck,* 832 F.2d at 39. A series of racketeering acts can be continuous and therefore a pattern if it either takes place over a substantial period of time or takes place over a short period of time but threatens to continue into the future. *Id.*

The Supreme Court in *H.J. Inc.* envisioned the continuity prong of the pattern analysis as involving a two-step inquiry. The first step is to determine whether the racketeering activity alleged involved an open-ended or a closed-ended period. An open-end period is alleged if there is a threat that the racketeering activity will continue into the future. In attempting to determine whether such a threat exists, the Court suggests that the answer "depends on the specific facts of each case." *H.J. Inc.*, 109 S.Ct. at 2902.

Without providing any standards for making the determination, the Court gives examples of open-ended activity that threatens to continue into the future. In one example, the threat of continuity is established by the nature of the predicate acts themselves. Where a hoodlum extorts protection money from neighborhood storekeepers while telling his victims that he intends to reappear from time to time to collect "premiums", the Supreme Court says that "the predicate acts themselves involve a distinct threat of long-term racketeering activity." *Id.* In another example, the Court states that continuity may be established by showing that the predicate acts are part of an ongoing entity's regular way of doing business. *Id.* In any event, the conclusion that racketeering activity threatens to continue into the future is to be made on a case by case basis. *Id.*

If the determination is made that the racketeering activity alleged involves a series of predicate acts which threaten to continue into the future, then the continuity prong of the pattern analysis is satisfied.

If, however, the conclusion is reached that there is no threat of the racketeering activity continuing into the future, then the second step of the analysis is to determine whether there was a threat of continued racketeering activity over a substantial period of time while the activity persisted. Thus, "[a] party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicate acts extending over a substantial period of time." *Id.* at 2902. In the assessment of whether the predicate acts oc-

curred over a substantial period of time, the Court warned that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.*

The *H.J. Inc.* decision can be read as holding that the only factor to be addressed in the continuity analysis of a closed-ended period is the duration of time over which the predicate acts occurred. In fact, the Court expressly stated that continuity is "centrally a temporal concept—and particularly so in the RICO context...." *Id.* at 2901.

This reading of *H.J. Inc.*, however, has not been universally embraced. *See H.J. Inc.*, 109 S.Ct. at 2907–08 (Scalia, J., concurring). In fact, a number of courts have continued to consider factors other than the duration of predicate acts in determining whether a series of racketeering activity constitutes a pattern in closed-ended periods. *See Sutherland v. O'Malley*, 882 F.2d 1196, 1205 (7th Cir.1989) (finding that the alleged activities did not constitute a pattern because the five month fraudulent scheme had a single victim, a single injury, a single perpetrator and no threat of the activity continuing into the future); *Menasco, Inc. v. Wasserman*, 886 F.2d 681 (4th Cir.1989) ("Defendants' actions were narrowly directed towards a single fraudulent goal.... They involved but one perpetrator.... They involved but one set of victims.... Finally, the transaction took place over approximately one year.... Here, plaintiff's allegation fail to satisfy the continuity prong of RICO's pattern requirement."); *U.S. v. Kaplan*, 886 F.2d 536 (2nd Cir.1989).

The Third Circuit has addressed this issue on two occasions since the Supreme Court decided *H.J. Inc.* In *Swistock v. Jones*, 884 F.2d 755 (3rd Cir.1989), the plaintiffs leased mining properties and purchased mining equipment from the defendants on the basis of representations made by the defendants that they were aware of no violations of environmental regulations with respect to the mining operations. The

plaintiffs alleged that these representations were fraudulent and brought suit in federal court asserting a violation of the RICO statute. The predicate acts alleged were a series of mail and wire frauds continuing over a period of more than one year. *Id.* at 759.

The District Court applied the six factor *Barticheck* analysis focusing primarily on three of the six factors, namely, number of victims, the number of perpetrators and the number of injuries alleged by the plaintiff. Finding that the allegations of the complaint were limited to the infliction of a single harm on a limited number of victims by a limited number of perpetrators, the court held that plaintiffs had been unsuccessful in proving the existence of a pattern. *Id.* at 758.

The Third Circuit reversed basing its decision not on the *Barticheck* factors cited by the District Court but on its determination that the predicate acts occurring over a period of fourteen months "established either the existence of a closed-end period of repeated conduct of sufficient length or a threat of continuity." *Id.* at 759. In its reasoning, the court said of the six factor *Barticheck* analysis that the "underpinnings of the district court's decision ha[d] been shaken" by the *H.J. Inc.* decision. *Id.* at 758. As a final note, the court advised that "[w]hatever vitality the single victim, single injury approach may have after *H.J. Inc.* awaits further case development." *Id.*

There is no question that the court in *Swistock* based its conclusion on the durational standard suggested by the Supreme Court in *H.J. Inc.* In doing so, the court also called in to question the continued viability of the Third Circuit multi-factor approach.

In its second brush with the RICO pattern continuity analysis, the Third Circuit was significantly more critical of the Supreme Court's primary concentration on the duration of the predicate acts. The Court stated in *Marshall–Silver Const. Co., Inc. v. Mendel*, 894 F.2d 593 (3rd Cir. 1990) ("Marshall–Silver II"), "[w]ithout more specific guidance from the Supreme

Court we are reluctant to embrace this reading of *H.J. Inc.*" *Id.* at 596.

*Marshall–Silver* involved the defendants' allegedly extortionate attempt to drive the plaintiffs out of business. The complaint alleged that the defendants, on three occasions over a five day period, threatened to put the plaintiff out of business if the plaintiff did not pay the defendants for work they had performed. When the work had not been paid for after six months, defendants carried out their threat by filing a fraudulent petition to put the plaintiff into bankruptcy.

The District Court found that the plaintiff's allegations failed to establish the existence of a pattern. In its first decision, the Third Circuit applying the *Barticheck* factors affirmed the District Court's decision. *Marshall–Silver Const. Co., Inc. v. Mendel*, 835 F.2d 63 (3rd Cir.1987), *vacated and remanded,* —— U.S. ——, 109 S.Ct. 3233, 106 L.Ed.2d 582 (1989) ("Here we have a single victim, a single injury, and a single short lived scheme with only two active perpetrators. This is not criminal activity with the kind of continuity of which we spoke in *Barticheck [v. Fidelity Union Bank,* 832 F.2d 36 (3rd Cir.1987) ].")

After having the case vacated and remanded for consideration in light of the *H.J. Inc.* decision, the Third Circuit again affirmed the decision of the District Court. This time, however, it is less clear upon which factors the court relied.

After stating its dissatisfaction which the Supreme Court's durational analysis, the court went on to discuss its deficiencies. It stressed that primary emphasis on the temporal relationship of the predicate acts in the continuity analysis brings within reach of the RICO statute conduct that was clearly not meant to be covered by it.

Virtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are "related" by purpose and are spread over a period of at least several months. Where such a fraudulent scheme inflicts or threatens only a single injury, we continue to doubt that Congress intended to make the availability of treble damages and aug-

mented criminal sanctions dependent solely on whether the fraudulent scheme is well enough conceived to enjoy prompt success or requires the pursuit for an extended period of time.

*Marshall–Silver II,* 894 F.2d at 597.

The court further noted that the pattern requirement was intended to ensure that RICO's extraordinary remedies did not threaten "the ordinary run of commercial transactions." *Id.* A pattern analysis that focuses solely on the duration of the predicate acts is at cross-purposes with this intention.

Instead of concentrating exclusively on the temporal aspect of the predicate acts, the *Marshall–Silver II* decision seems to suggest taking into account other factors such as the number of victims and the number of perpetrators involved in the criminal conduct and, most significantly, the number of injuries.

> Moreover, if the Court in *H.J. Inc.* intended that the *duration* of the predicate acts or the threat arising therefrom should be determinative without reference to whether the societal threat was limited to a single, one time injury, we would not have expected the Court to eschew providing a specific standard in favor of a fact oriented, case-by-case development.

*Id.* (emphasis in original); *see also Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1166 (3rd Cir.1989).

Despite the court's criticism of the *H.J. Inc.* analysis and its intimation that other factors should be considered in the analysis, its affirmance of the District Court opinion ultimately rested on the fact that the predicate acts alleged were concluded in less than seven months. Implicit in the court's ruling was the finding that because the acts were alleged to have occurred over a closed-ended period of time with no threat of continuity into the future, the duration of the predicate acts was the dispositive factor and a duration of less than seven months was not of such substantial length as to be considered a pattern. Quoting *H.J. Inc.,* the court reiterated, "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement: Congress was concerned in RICO with long-term criminal conduct." *Marshall–Silver II,* 894 F.2d at 596, (quoting *H.J. Inc.,* 109 S.Ct. at 2901.)

This Court need not determine whether the *Barticheck* multi-factor approach survives the *H.J. Inc.* durational approach because, like *Marshall–Silver II,* this is one of those cases expressly resolved by the *H.J. Inc.* decision; that is, it is a closed-ended period of racketeering activity not of sufficient duration to be considered a pattern.

■ It is clear that this case presents a closed-ended period because there is no threat that the activity complained of will continue into the future.

To begin with, the only racketeering activities alleged in the Complaint and RICO Case Statement occurred during the period from February of 1988, when the first solicitations were mailed, to November of 1988, when the election occurred. There are no allegations that any acts of racketeering took place between the November election and the time the Complaint was filed in this action in October of 1989. Nor does the Complaint or the RICO Case Statement allege that there is a threat that any acts of racketeering will occur in the future.

In addition, as alleged in the Complaint, the purported fraudulent scheme entailed funneling campaign contributions from Castle's campaign to Wolf's campaign. The likelihood that this activity will continue in the future is remote because Castle is precluded by Delaware law from running for a third term as Governor.

Further, the sole objective of the alleged fraudulent scheme was to elect Dale Wolf as Lieutenant Governor. That goal was accomplished in November of 1988. The goal having been accomplished, there ceases to be a threat of continued racketeering activity. *See, e.g., Fiorentino v. Converse,* (3rd Cir. Aug. 14, 1989) 884 F.2d 1383 (Table) No. 89–1169 slip op. at 4; *Marshall–Silver II,* 894 F.2d at 597.

Finally, the facts alleged by the Plaintiff do not resemble any of the examples of racketeering activity described by the Supreme Court in *H.J. Inc.* that threaten to continue into the future. This case certainly is not analogous to the extortion scheme where the threat of long-term criminal activity can be established from the nature of the predicate acts themselves. *H.J. Inc.*, 109 S.Ct. at 2902. Nor is this a case where the predicate acts are alleged as part of an ongoing entity's regular way of doing business. *Id.*

■ It is clear then, that the activity alleged in the complaint does not threaten to continue into the future. It is also clear that the closed-ended period over which the activity is alleged to have taken place was not of sufficient duration to be considered a pattern.

The Third Circuit in *Fiorentino v. Converse*, 884 F.2d 1383 (Table) No. 89–1169, slip op. at 4, held that racketeering activity occurring over a closed ended period of "about one year" did not constitute a pattern. Acknowledging that the RICO statute is primarily concerned with long-term criminal activity, the Third Circuit held that a closed ended period of one year was not considered long-term. *Id.*

In *Marshall Silver II*, the Third Circuit held that a closed-ended period of seven months with no threat of continuity into the future was not substantially long enough to be considered a pattern. Finding that "... the predicate acts themselves were concluded in less than seven months", the court held that "[t]his is one of those cases expressly resolved by *H.J. Inc.* when the Court observed: 'Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement: Congress was concerned in RICO with long-term criminal conduct.'" 894 F.2d at 597 (quoting *H.J. Inc.*, 109 S.Ct. at 2901).

In the present situation, the predicate acts took place over a period of, at most, eight months. It would seem from the preceding cases that eight months of criminal activity with no threat of continuity into the future is simply not substantial

enough to be considered long-term criminal activity. The great weight of authority supports this position. *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F.Supp. 579 (S.D.N.Y.1989) (holding that a closed-ended period of less than thirteen months was not sufficiently long to be considered a pattern); *McCain v. Phoenix Resources, Inc.*, No. 84–CIV–0901, slip op., Kram, J., 1989 WL 146212 (S.D.N.Y. Nov. 17, 1989) (activities occurring over ten months do not satisfy the continuity requirement for a closed-ended pattern); *Fry v. General Motors Corp.*, 728 F.Supp. 455 (E.D.Mich. 1989) (closed-ended period of one year and seven months was not sufficiently long enough to be considered a pattern.); *Hutchinson v. Wickes*, 726 F.Supp. 1315 (N.D.Ga.1989) (questioning whether a two year closed-ended period is of sufficient length.); *Banks v. Wolk*, No. 89–7219, slip op., Broderick, J., 1989 WL 153936 (E.D.Pa. Dec. 15, 1989) (holding that a six month closed-ended period did not satisfy the continuity requirement.); *Azurite Corp., Ltd. v. Amster & Co.*, 730 F.Supp. 571 (S.D.N.Y. 1990) (a closed-ended period of seven months with no threat of continuity into the future does not constitute a pattern.)

Because the activities alleged in the case at bar took place over a period of, at most, eight months and, because there is no threat that this activity will continue into the future, Plaintiff has failed to allege the type of long-term criminal activity necessary to satisfy the continuity prong of the pattern requirement. The failure to allege a pattern of racketeering activity is fatal to the Plaintiff's RICO cause of action.

B. *Policy Concerns*

■ In support of their motion to dismiss the complaint, the Defendants cite a number of policy concerns regarding the Plaintiff's use of the federal court in seeking damages incurred in a state election.

The first policy concern raised by Defendants centers on whether it is appropriate for the federal court to interfere in the regulation of a state election. Citing numerous authorities, the Defendants contend that states have the primary authority

to regulate the election of their own officials. *See Oregon v. Mitchell,* 400 U.S. 112, 125–26, 91 S.Ct. 260, 265, 27 L.Ed.2d 272 (1970); *Curry v. Baker,* 802 F.2d 1302, 1315 (11th Cir.1986). Any intervention by this Court, Defendants claim, would impinge upon the authority which is vested in the states.

While it cannot be denied that states have principle authority to regulate their own elections and " 'intervention by federal courts in state elections has always been a serious business' not to be lightly engaged in", *Oden v. Brittain,* 396 U.S. 1210, 90 S.Ct. 4, 24 L.Ed.2d 32 (1969), *quoted in Chisom v. Roemer,* 853 F.2d 1186, 1189 (5th Cir.1988), this case can be resolved without any such intervention.

The Plaintiff in this case does not seek intervention in the election process. He does not seek to have the 1988 election overturned. His only prayer for relief is compensation for the campaign expenditures that the Defendants' alleged fraud forced him to spend. Although part of the Plaintiff's case alleges that the fraudulent scheme violated Delaware election financing laws, the Delaware law violation is not essential to the validity of the claim. It is possible for this Court to make a determination in this case without either overturning the election or passing on Delaware election financing laws. The Defendants' policy concern about federal intervention in state elections is unfounded.

Another policy concern raised by the Defendants is more applicable to the present case. In a case fairly similar to the present one, the Fourth Circuit dismissed a complaint alleging violations of RICO and 42 U.S.C. § 1983 on the ground that federal courts should not be available for providing awards of money damages to defeated candidates in state elections. *Hutchinson v. Miller,* 797 F.2d 1279 (4th Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). In *Hutchinson,* the Plaintiffs were three unsuccessful candidates for public office who sought to recover approximately 9 million dollars in damages for alleged irregularities in the 1980 general election. The District Court dismissed the complaint and the Court of Appeals affirmed stating:

> We conclude that federal courts are not available for awards of damages to defeated candidates. * * * Our constitution does not contemplate that the federal judiciary routinely will pass judgment on particular elections for federal, state or local office. The conduct of elections is instead a matter committed primarily to the control of states, and legislative bodies are traditionally the final judges in their own membership. The legitimacy of democratic politics would be compromised if the results of elections were regularly to be rehashed in federal courts. Federal courts, of course, have actively guarded the electoral process from class-based discrimination and restrictive state elections laws. This suit, however, asks us to consider the award of damages for election irregularities that neither disenfranchised a class of voters nor impugned state and federal procedures for the proper conduct of elections.... [W]e refuse to authorize yet another avenue for those disgruntled with the political process to keep the contest alive in the courtroom.

*Hutchinson,* 797 F.2d at 1280. Other courts have voiced the same concerns in suits claiming damages for violations of 42 U.S.C. § 1983 in the election context. In *Soules v. Kauaians for Nukolii Campaign Committee,* 849 F.2d 1176, 1182 (9th Cir.1988), plaintiffs claimed that they were entitled to damages for their expenditure of funds in opposition to an allegedly unconstitutional ballot initiative. The court declined to entertain their claim for damages. In doing so, the court stated:

> To permit a Section 1983 damage action under these circumstances ... would open the door for "sore losers" to rehash virtually every election campaign in the federal courts long after the election process should have given way to the process of governance. Such a ruling would provide a perverse incentive for every "losing candidate to ignore the principal routes established to challenge an election and to proceed instead to have the

election reviewed in federal court in hopes of gaining monetary compensation."

*Soules,* 849 F.2d at 1182, *quoting Hutchinson,* 797 F.2d at 1286. Although the present case does not allege a 42 U.S.C. § 1983 violation, the policy issues are applicable nonetheless. The essence of Plaintiff's claim is that election irregularities forced him to spend more money to compete against Wolf. Despite the expenditure of additional campaign funds, the Plaintiff lost the election. The Plaintiff brought this case to recoup his losses. His claim is similar to that in *Hutchinson* and *Soules* and, for the same policy reasons expressed by those courts, this Court finds that it would be inappropriate to allow the Plaintiff to utilize the federal courts to obtain monetary damages for losses incurred as a result of alleged irregularities in a state election.

## III. CONCLUSION

The primary deficiency with the Plaintiff's complaint which compels this Court to grant the Defendants' motion to dismiss is that the complaint fails to allege a "pattern of racketeering activity" which is necessary for the RICO claim asserted by the Plaintiff. Although, as stated above, the Court's decision rests upon the pattern determination, the policy concerns involved weigh heavily in favor of dismissing the complaint. In light of the foregoing, the Defendants' argument that the Plaintiff lacks standing to bring the RICO action is moot.