James C. YOUNG, et al., Plaintiffs,

v.

WEST COAST INDUSTRIAL RELATIONS ASSOCIATION, INC., et al., Defendants.

Civ. A. No. 88–692 LON.

United States District Court,
D. Delaware.

April 17, 1991.

Perry F. Goldlust of Heiman, Aber & Goldlust, Wilmington, Del. (Hugh J. Beins, and John R. Mooney of Beins, Axelrod, Osborne & Mooney, Washington, D.C., of counsel), for plaintiffs.

Michael B. McCauley of Palmer Biezup & Henderson, Wilmington, Del. (Martin E. Crandall of Stringari, Fritz, Kreger, Ahearn, Hunsinger, Bennett & Crandall, Detroit, Mich., of counsel), for defendant West Coast Indus. Relations Ass'n, Inc.

Robert F. Stewart, Jr., Ronald F. Kidd, Teresa N. Cavenagh of Duane, Morris & Heckscher, Wilmington, Del., for remaining defendants.

Carolyn T. Greene, U.S. Attorney's Office, Wilmington, Del. (Eric G. Moskowitz, N.L.R.B., Washington, D.C., of counsel), for intervenor N.L.R.B.

## OPINION

LONGOBARDI, Chief Judge.

This is a civil action brought pursuant to Sections 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations ("RICO") provisions of United States Code, 18 U.S.C. § 1961, *et seq.*, and tortious interference with contract rights which are grounded in Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, and state law.

This Court has jurisdiction pursuant to 18 U.S.C. § 1964, 28 U.S.C. § 1331, 28 U.S.C. § 1337 and under the doctrine of pendant jurisdiction. Defendants have moved for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Intervenor, the National Labor Relations Board (the "NLRB"), has moved for a partial dismissal of Plaintiffs' complaint on the ground that, because certain allegations expressed therein are based exclusively on the protections afforded employees under Section 7 of the National Labor Relations Act, 29 U.S.C. § 157 (the "NLRA" or "Labor Act"), those allegations are preempted and not properly part of a RICO suit.

## I. FACTS

Defendants NKS Distributors, Inc. ("NKS"), Century Wine & Spirits, Inc. ("Century"), Delaware Beverage Company, Inc. ("Delaware Beverage") and Standard Distributing Company ("Standard") are corporations engaged in the wholesale liquor distribution business in the State of Delaware. These Defendants are collectively referred to as the "Employers."

Defendants J. Paul Tigani, James Tigani, Sr., James Tigani, Jr., Robert Tigani, Joe Renzette and Michael Fusca are individuals who are officers, agents and/or representatives of the Employers (the "Tiganis"). Defendant West Coast Industrial Relations Association, Inc. ("WCIRA") is a California corporation engaged by the Employers as a labor relations consultant. Plaintiff Teamsters Local Union No. 326 (the "Union") is a labor organization which is the exclusive bargaining representative of individual Plaintiffs named in the complaint who are employees of the Employers.

The Union has been a party to collective bargaining agreements with each of the respective Employers for a period spanning the last twenty to thirty years. The collective bargaining agreements currently in dispute were unquestionably effective from April 1, 1985, to at least March 31, 1988. These contracts included a duration clause that provided for the renegotiation or, in the alternative, for the termination of the agreement upon sixty days notice prior to the contractual expiration date.

The parties commenced negotiations for new collective bargaining agreements on March 4, 1988. On April 1, 1988, one day after the alleged "termination" of the collective bargaining agreements in dispute, the Employers repudiated the grievance and arbitration provisions of the agreements. On September 20, 1988, the Employers unilaterally implemented their "final offer" which contained new terms and conditions of employment for their employees. The changes included wage cuts and withdrawal from the Union's health and welfare and pension plans.

On September 26, 1988, January 11, 1989, and February 10, 1989, the Union filed unfair labor practice charges against the Employers with the NLRB's Fourth Region in Philadelphia, Pennsylvania. A consolidated complaint was subsequently issued alleging that the Employers unilaterally changed terms of employment during the term of an existing agreement in violation of Sections 8(a)(1), (3) and (5) of the Labor Act, 29 U.S.C. §§ 158(a)(1), (3) and (5).[1] The complaint asserted that the

---

1. The Regional Director issued a complaint on the charges on December 30, 1988, amended on

March 28, 1989, and April 4, 1989.

collective bargaining agreements were never properly terminated, remained in effect at least through March 31, 1989, and that the Employers thus unlawfully implemented their final offer during the operational term of the agreements.

On September 20, 1989, an Administrative Law Judge ("ALJ") held that the NLRB had failed to prove that the Employers had violated Sections 8(a)(1), (3) and (5) of the Labor Act as alleged in the complaint. The ALJ based his holding on the finding that the collective bargaining agreements between the Union and each of the respective Employers terminated on March 31, 1988. As the contracts terminated on that date, the Employers did not act unlawfully when they unilaterally implemented their final offer in September.

Prior to the ALJ's decision, Plaintiffs commenced the present action by filing their initial complaint on or about December 12, 1988, amended on December 21, 1988. On January 18, 1990, the NLRB filed a motion to dismiss eight allegations of the Plaintiffs' complaint.[2] The NLRB contends that eight of the allegations in Plaintiffs' amended complaint are based exclusively on the protections afforded employees under Section 7 of the NLRA, 29 U.S.C. § 157, and that those allegations are preempted by and not properly part of a RICO suit. Defendants have moved to dismiss the Plaintiffs' amended complaint under Federal Rules of Civil Procedure 12(b)(1) and (6) on the grounds that Plaintiffs have failed to plead a proper RICO claim; Plaintiffs are collaterally estopped from relitigating the issues previously dismissed by the ALJ; Plaintiffs' amended complaint is preempted by the exclusive jurisdiction of the NLRB; and that the pendant state law claims must be dismissed for lack of subject matter jurisdiction.

## II. DISCUSSION

### A. Legal Standard

▮ The Court, in determining a motion to dismiss for failure to state a claim upon which relief may be granted, must presume that all the factual allegations stated in the complaint are true and make all reasonable inferences in favor of the non-moving party. Miree v. DeKalb County, Georgia, 433 U.S. 25, 27 n. 1, 97 S.Ct. 2490, 2492 n. 1, 53 L.Ed.2d 557 (1976); Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3rd Cir.1989). A complaint should not be dismissed unless it can be established that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); see also 2A Moore's Federal Practice, ¶ 12.07[2.–5] at 12–65 (2d ed. 1988 & supp. 1990).

▮ The burden of demonstrating that no claim has been stated upon which relief can be granted is on the movant. Johnsrud v. Carter, 620 F.2d 29, 33 (3rd Cir. 1980). Claims under RICO are subject to the same pleadings standards as other claims under Rule 12(b)(6). See H.J., Inc. v. Northwestern Bell, 492 U.S. 229, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989); Rose v. Bartle, 871 F.2d 331, 355–56 (3rd Cir.1989).

### B. RICO Claims

In Counts I and II of the amended complaint, Plaintiffs allege that the Defendants' conduct in unilaterally altering the terms of the collective bargaining agreements and conspiring to do the same violated 18 U.S.C. §§ 1962(c) and (d) of the RICO Act.[3] Defendants brought the present mo-

---

**2.** Earlier in the litigation, on August 9, 1989, the NLRB filed motions to intervene and to stay the instant proceedings pending resolution by the Board of the unfair labor practice case.

**3.** The pertinent provisions of RICO proscribe the following activities, 18 U.S.C. § 1962:
  (c) It shall be unlawful for any person employed by or associated with any enterprise

engaged in ... interstate or foreign commerce, to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity....
  (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

tion to dismiss on the grounds that Plaintiffs have failed to plead proper predicate racketeering acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343, or embezzlement, 18 U.S.C. § 664; Plaintiffs have failed to allege a proper RICO pattern of racketeering activity; Plaintiffs have failed to plead a proper RICO enterprise; and that RICO is unconstitutionally vague and violative of due process.[4] The Court will address those arguments which are necessary to the disposition of Defendants' 12(b)(6) motion.

### 1. *Mail and Wire Fraud*

Racketeering activity, as defined by Section 1961(1) of RICO, includes both state law crimes such as murder or extortion and a specified list of federal crimes such as mail and wire fraud. 18 U.S.C. § 1961(1). In order to successfully plead a pattern of racketeering activity, it must be demonstrated that a defendant has committed at least two predicate acts of racketeering activity within a ten year period. 18 U.S.C. § 1961(5). In the complaint, Plaintiffs allege predicate acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343. Specifically, Plaintiffs assert that Defendants participated in a scheme to defraud Plaintiffs of economic rights and benefits guaranteed them under the collective bargaining agreements. Plaintiffs contend that as the mails and wires were used to further the alleged scheme, Defendants have committed the requisite predicate acts of mail and wire fraud.

### (a) Predicate Acts

■ The statutory provisions dealing with mail and wire fraud, 18 U.S.C. §§ 1341, 1343, encompass "any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter v. United States*, 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987). The term "to defraud" in this context has the "common understanding" of "wronging one in his property rights by dishonest methods or schemes and usually signif[ies] the dep-

rivation of something of value by trick, deceit, chicane or overreaching." *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987) (quoting *Hammerschmidt v. U.S.*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)).

The elements of a mail fraud statute violation are a scheme to defraud, participation by the defendant in the scheme with specific intent to defraud and the use of the post office in furtherance of the scheme. *U.S. v. Burks*, 867 F.2d 795, 797 (3rd Cir. 1989). Similarly, a violation of the wire fraud statute requires a scheme to defraud, defendant's participation with specific intent and an interstate wire transmission in furtherance of the scheme. *In re Phillips Petroleum Securities Litigation*, 881 F.2d 1236, 1249 (3rd Cir.1989). In pleading the fraud element of a wire or mail fraud violation, it is only necessary "to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 790–91 (3rd Cir. 1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985).

In the present case, Plaintiffs have alleged that Defendants' scheme to defraud the Plaintiffs of economic rights under the collective bargaining agreements consisted of a plan: to negotiate and propose drastic reductions of 30% or more in the employees' wages and economic benefits under the contracts; engage in bad faith bargaining with the Union; force an impasse in bargaining; and thereby precipitate a strike on or after April 1, 1988. Once the strike commenced, the Employers planned to hire permanent replacements. In the event the Union refused to strike, the scheme was to unilaterally institute the proposed changes in the contracts. It is alleged that this activity would effectively

---

**4.** For the purposes of the RICO allegations, the term "Defendants" shall refer only to WCIRA and the Tiganis. The other named parties to this action will be referred to as the Employers.

destroy the Union and the economic rights of the employees. D.I. 4 at 19.

Plaintiffs assert that in furtherance of the conspiracy, the Employers, the Tiganis and WCIRA, consistently used the "United States mails, interstate telephone lines and wire services" to communicate with the Union. *Id.* at 21. The Plaintiffs have provided thirty-three exhibits as evidence that the Employers and/or West Coast authored letters delivered by the United States Postal Service by FAX or by Federal Express. *Id.*, Exhibits A–AG. In support of the wire fraud claim, Plaintiffs contend that Defendants regularly communicated by telephone with the Union and its counsel from January, 1988, to October, 1988. Plaintiffs also charge that, consistent with the scheme to defraud, the Defendants met in Wilmington, Delaware, for contract negotiations on seventeen occasions from March 4, 1988, to August 24, 1988. D.I. 4 at 20. *See Provident Nat. Bank v. Frankford Trust Co.,* 468 F.Supp. 448, 450 n. 2 (E.D.Pa.1979) (considering documents attached to complaint as exhibits and incorporated into the pleadings).

Defendants have moved for dismissal of Plaintiffs' mail and wire fraud claims on the ground that Plaintiffs' allegations of fraud are insufficient because the alleged scheme simply does not amount to fraud. In support of their motion, Defendants make two contentions. First, Defendants assert that Plaintiffs' allegations of fraud are insufficient because Plaintiffs have failed to allege any misrepresentations in connection with the alleged scheme to defraud. Second, Defendants argue that the scheme to defraud is insufficient because Plaintiffs have failed to allege any other conduct which may have misled or deceived them.

It is well settled law in this Circuit that schemes to defraud come within the scope of the mail and wire fraud statutes "even absent a false representation." *United States v. Frankel,* 721 F.2d 917, 921 (3rd Cir.1983). Accordingly, Defendants' first argument is rejected.

Defendants' second contention is more problematical because the caselaw in this Circuit is somewhat unsettled on the point of whether it is necessary to plead a misrepresentation, a deceitful omission or a deceitful practice in a mail or wire fraud claim. For example, in *United States v. Frankel,* 721 F.2d 917, a defendant was indicted under the mail and wire fraud statutes for engaging in a check kiting scheme by which he would deposit checks in various banks even though he knew that there were insufficient funds to support the checks. *Id.* at 918.[5] The prosecution based its indictment on the theory that when the defendant deposited his worthless checks he impliedly misrepresented to the bank that he had sufficient funds to cover them.

The lower court dismissed the indictment based on the Supreme Court's opinion in *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), which held that "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as true or false." *Williams,* 458 U.S. at 284, 102 S.Ct. at 3091. The *Frankel* court, in reviewing the lower court's decision, agreed and held that as the prosecution had chosen to rely on a misrepresentation theory, they were obligated to prove it. Consequently, in light of *Williams,* the court found "no error in the dismissal of the indictment as drawn, because it relies on a misrepresentation theory unsupported by the allegations." *Frankel* 721 F.2d at 919.[6]

The *Frankel* court then went on, however, noting that the mail fraud statute, a pertinent part of which reads "whoever, having devised or intending to devise any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... shall be fined not more than $1,000 or imprisoned not more than five

---

5. Defendant also made several phone calls, presumably to delay the processing of the checks, thereby arguably violating the wire fraud statute. *Id.*

6. The *Frankel* court also dismissed the wire fraud violations on the theory that the challenged activity was in the same category as the presentation of the checks.

years or both", 28 U.S.C. § 1341 (1982),[7] as originally enacted, did not contain the reference to "obtaining money ... by ... fraudulent pretenses...." and spoke only to schemes or artifices to defraud. The court reasoned that when the second clause was added "to identify and proscribe a particular course of conduct, it does not follow that the first and more general clause was restricted by the amendment." *Frankel*, 721 F.2d at 920.

Accordingly, the *Frankel* court concluded that "scheme or artifice to defraud" should be read independently of "obtaining money by false pretenses." *Id.* at 921. Not wishing "to be understood as endorsing an overly expansive theory of the breadth of section 1341", the *Frankel* court cautioned that the above reading of the mail fraud statute should be limited to the statement that "a scheme need not include false representations to violate the scheme or artifice clause of section 1341." *Id. See also U.S. v. Schwartz*, 899 F.2d 243, 247 (3rd Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 259, 112 L.Ed.2d 217; *U.S. v. Olatunji*, 872 F.2d 1161, 1165 (3rd Cir.1989). Judge Sloviter, in a concurring opinion, counseled that the majority's dictum "raises more questions than it answers" and warned that the "failure to limit or define 'schemes to defraud' may leave open the construction that even a deceitful omission is not required." *Frankel*, 721 F.2d at 921.

Cases in this Circuit addressing mail and wire fraud schemes arising in the context of collective bargaining agreements have only added to the uncertainty. In *United States v. Boffa*, 688 F.2d 919 (3rd Cir.1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983), defendants engaged in a "labor switching" scheme by which labor-leasing contracts at various industrial plants were switched from companies controlled by the defendants to other allegedly "independent" companies, also controlled by the defendants. *Id.* at 923–24. By representing that the new companies were "independent" when in fact they were not, the *Boffa* defendants induced the industrial plant employers to terminate the labor-lease contracts with the unionized employees and obtain new contracts with nonunionized employees at more favorable terms. *Id.* As a result, the union employees lost their jobs, wages and benefits. Defendants also sought union acquiescence by bribing the president of Teamster's Union Local 326. *Id.*

The *Boffa* court did not have to reach the question of whether the defendants' labor-switching scheme constituted a deceptive practice because misrepresentations had been made in furtherance of the scheme. The *Boffa* court noted, however, that "[t]here can be little doubt that ... schemes are within the scope of § 1341 [when] they involve calculated efforts to use misrepresentation *or other deceptive practices* to induce the innocent or unwary to give up some tangible property interest." *Id.* (emphasis added) (quoting *United States v. McNeive*, 536 F.2d 1245, 1248–49 (8th Cir.1976)). Apparently, the *Boffa* court envisioned a situation where, even in the absence of affirmative misrepresentations, a scheme to defraud might still constitute a mail fraud violation if the scheme itself constituted a practice designed to deceive.

Similarly, in *McLendon v. Continental Group, Inc.*, 602 F.Supp. 1492 (D.N.J.1985), the defendants were alleged to have engaged in a scheme where union employees who were close to satisfying the requirements for special pension benefits were laid off under the guise of an austerity program. *Id.* at 1497. As in the present case, defendants moved to dismiss the fraud allegations on grounds that the plaintiffs had failed to allege any misrepresentations or omissions made in furtherance of the scheme. After reviewing the *Frankel* decision, the District Court denied the motion and found that a "secret plan" to deprive selected employees of pension benefits operating under the guise of economic necessity constituted a "scheme to de-

---

**7.** Although this discussion only addresses the mail fraud statute, the same principles apply to the wire fraud statute. *See United States v. Tarnopol*, 561 F.2d 466, 475 (3rd Cir.1977).

fraud" that did not require any misrepresentations or omissions. *Id.* at 1507–09.

Based on the above precedent, it is clear to the Court that at the very least, "a scheme [to defraud] need not include false representations to violate the scheme or artifice clause of section 1341." *Frankel,* 721 F.2d at 921. What is not clear to the Court is whether it should adopt Judge Sloviter's suggestion that a scheme to defraud should include at least a deceitful omission or whether it should address the dicta of the labor cases and hold that, at a minimum, a practice designed to deceive is required. In the instant case, such a decision is unnecessary because the Plaintiffs have failed to allege a misrepresentation, deceitful omission or even some "other deceptive practice" as part of Defendants' purported scheme to defraud. Indeed, given the candid nature of Defendants' conduct as alleged in Plaintiffs' amended complaint, this Court finds it troublesome to discover how Plaintiffs were deceived or even how Defendants intended to deceive them.

For example, in paragraph 43 of the amended complaint, Plaintiffs allege that in June of 1985, Defendant J. Paul Tigani told an employee of Standard that, in three years, Standard would get rid of the Union and become a nonunion operation. Paragraph 39 alleges that in the spring of 1987, Defendant James Tigani, Jr. explicitly stated the components of the alleged scheme. Paragraph 40 alleges that in 1987 and 1988, Defendant James Tigani, Jr. stated his intention to punish and get rid of the Union. Paragraph 41 alleges that in October of 1987 and March of 1988, James Tigani, Jr. once again repeated the elements of the alleged scheme to defraud. Finally, paragraph 27 alleges that Defendants began advertising for strike replacements in February of 1988, indicating at least some advance notice of Defendants' intentions.

This Court believes that at least some sort of deception or "other deceptive practices" should be alleged in order to warrant the intrusion of the draconian civil RICO remedies of treble damages, forfeiture and attorneys fees in what would otherwise be an ordinary breach of contract claim. *See United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir.1980) ("the [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract: Its condemnation of a 'scheme or artifice to defraud' implicates only plans calculated to deceive."). The Third Circuit's most recent pronouncement on mail fraud is not inapposite. In *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1416 (3rd Cir.1991), the court examined each of the plaintiff's allegations of fraud to determine whether "alleged acts or omissions could be 'reasonably calculated to deceive a person of ordinary prudence and comprehension.'" (quoting *U.S. v. Pearlstein,* 576 F.2d 531, 535 (3rd Cir.1978). Accordingly, the Court must dismiss Plaintiffs' RICO fraud claims for failure to state a claim upon which relief can be granted.

Alternatively, the Court believes that even if Plaintiffs had alleged an adequate scheme to defraud, the Court would still be compelled to dismiss Plaintiffs' fraud claims as Plaintiffs have also failed to allege a sufficient pattern of RICO activity.

### (b) Pattern of Racketeering Activity

In *H.J. Inc. v. Northwestern Bell Tel. Co.,* 109 S.Ct. 2893, the Supreme Court held that a pattern of RICO activity requires that the predicate acts of racketeering activity must be both related and continuous. *Id.* 109 S.Ct. at 2900. The relatedness of the predicate acts is determined by examining whether the pattern of criminal acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* 109 S.Ct. at 2901. In the present case, neither party disputes that all of the alleged predicate acts in the purported scheme were related.

The second prong of the pattern analysis involves a two-step inquiry into the continuity of the alleged predicate acts. In the first step, it must be determined whether the racketeering activity is "open-ended", referring to whether the past conduct "by

its nature projects into the future with a threat of repetition." *H.J. Inc.*, 109 S.Ct. at 2902 (citing *Barticheck v. Fidelity Union Bank/First Nat. State*, 832 F.2d 36, 39 (3rd Cir.1987)). If it is determined that the alleged predicate acts do not constitute an open-ended period of racketeering activity, the second step is to determine whether the alleged pattern took place over a substantial period of time but has finished and is thus "close-ended." *H.J. Inc.*, 109 S.Ct. at 2902.

The Supreme Court did not provide any standards for concluding when an alleged pattern of conduct is open-ended but did state that the determination "depends on the specific facts of the case" and provided examples of racketeering activity that threatens to continue into the future. *Id.* One example involves a hoodlum who extorts protection money from neighborhood shopkeepers and threatens to return in the future to collect additional premiums. In this instance, "the predicate acts themselves involve a distinct threat of long-term racketeering activity." *Id.* In another example, the court stated that the requisite continuity may be established by demonstrating that the alleged predicate acts are part of an entity's regular way of doing business. *Id.*

This Court has addressed the continuity prong of the RICO pattern analysis in two recent cases, *Helman v. Murry's Steaks, Inc.*, 742 F.Supp. 860 (D.Del.1990), and *Hindes v. Castle*, 740 F.Supp. 327 (D.Del. 1990).[8] In *Helman,* the plaintiff alleged that the defendants, through fraudulent misrepresentations and omissions, induced the plaintiff and her mother to sell their minority interest in the family business for less than its true value. The alleged predicate acts of racketeering were violations of the mail fraud, wire fraud and securities fraud statutes. 18 U.S.C. §§ 1341, 1343; 15 U.S.C. § 78j(b). This Court concluded that the racketeering activity failed to threaten to continue into the future because the object of the scheme was realized when the plaintiff and her mother sold

their stock. *Helman,* 742 F.Supp. at 881. Once the object was realized, the scheme concluded and there was no threat of future activity. *Id.*

In *Hindes,* the defeated candidate for lieutenant governor in the 1988 Delaware election brought a Rico action against the governor, lieutenant governor, their campaign chairman, treasurer and advisor. The plaintiff alleged that the defendants violated the RICO statute by fraudulently soliciting funds through the mail during the election campaign and that, in order to remain competitive, the plaintiff was forced to incur an additional $350,000 in campaign expenses. *Hindes,* 740 F.Supp. at 330. This Court, after reviewing the Supreme Court's continuity prong analysis in *H.J., Inc.,* dismissed the RICO claims based on the conclusion that the sole objective of the alleged fraudulent scheme was to elect "Dale Wolf as Lieutenant Governor. That goal was accomplished in November of 1988. The goal having been accomplished, there ceases to be a threat of continued racketeering activity." *Hindes,* 740 F.Supp. at 335. In addition, since the purported fraudulent scheme "entailed the funneling [of] campaign contributions from [Governor] Castle's campaign to Wolf's campaign ... [t]he liklehood that this activity will continue in the future is remote because Castle is precluded by Delaware law from running for a third term as Governor." *Id.*

The Third Circuit in *Marshall–Silver Const. Co., Inc. v. Mendel,* 894 F.2d 593 (3rd Cir.1990) ("Marshall–Silver II"), has provided additional guidance in this respect stating that:

> Virtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are "related" by purpose and are spread over a period of at least several months. Where such a fraudulent scheme inflicts or threatens only a single injury, we continue to doubt that Congress intended to make the availability of treble damages and augmented criminal sanctions dependent

---

8. *Helman* involved a motion for summary judgment while *Hindes* was decided on a motion to

dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

solely on whether the fraudulent scheme is well enough conceived to enjoy prompt success or requires pursuit for an extended period of time.

*Id.* at 597.

In the case at bar, Plaintiffs have alleged numerous preparatory acts leading up to the infliction of a single basic injury, the unilateral implementation of new terms and conditions into an existing collective bargaining agreement. Simply put, the alleged "pattern of RICO activity" involves a single set of "perpetrators", a single set of "victims", a single injury.[9] Arguably, Plaintiffs have suffered continuing economic injury for as long as the new terms and conditions have been a part of the collective bargaining agreements. The question arises, however, whether this continuing injury constitutes distinct and separate injuries in the sense that they signal or by themselves constitute a threat of continuing criminal activity.

As in *Helman* and *Hindes,* the purported fraudulent scheme in the present case had but a single objective, the "breaking" of the union and implementation of wage and benefit cuts. Once that goal was accomplished, there could be no threat of future racketeering activity, unlike the hoodlum who returns to collect additional "premiums." Nor does "breaking unions" appear to be the Defendants' regular way of doing business. Accordingly, Plaintiffs' allega-

tions have failed to satisfy the "open-ended" prong of the continuity analysis.

The conclusion, however, that there is no threat of racketeering continuing into the future does not end the analysis. The second step of the inquiry is to determine whether there is "a series of related predicate acts extending over a substantial period of time." *H.J., Inc.,* 109 S.Ct. at 2902. In *H.J., Inc.,* the Supreme Court stated that "[p]redicate acts extending over a few weeks or months and threatening no future conduct do not satisfy this requirement: Congress was concerned with long-term criminal conduct." *Id.*

In the instant case, Plaintiffs allege that "[b]eginning in or about May 1987, and at least since October of 1987, the Defendants engaged in a conspiracy, scheme or plan to defraud the Union and the employees...." D.I. 4 at 18. The purported scheme allegedly culminated in the repudiation of the collective bargaining agreements on April 1, 1988, and the unilateral implementation of wage and benefit cuts on September 20, 1988. *Id.* at 19–20. Accordingly, accepting Plaintiffs' allegations as true, the duration of the predicate acts of racketeering activity took place over a period of, at most, eleven to fourteen months.[10] In *Helman,* this Court concluded that fraudulent activities extending over twelve months were not sufficient to constitute the requisite pattern. *Helman,* 742 F.Supp. at 882. In *Hindes,* eight months of alleged fraudulent

---

**9.** The *Marshall–Silver II* decision suggests that rather than concentrating solely on the temporal aspects of predicate acts, other factors, such as the number of victims, the number of perpetrators and the number of injuries are also relevant:

> if the Court in *H.J. Inc.* intended that the *duration* of the predicate acts or the threat arising therefrom should be determinative without reference to whether the societal threat was limited to a single, one time injury, we would not have expected the Court to eschew providing a specific standard in favor of a fact oriented, case-by-case development. *Id.* at 597 (emphasis in original); *see also U.S. Textiles, Inc. v. Anheuser Busch Companies,* 911 F.2d 1261, 1269 (7th Cir.1990) ("[I]dentical economic injuries ... stemming from a single contract were not the type of injuries which congress intended to compensate via the civil provisions of Rico.").

**10.** The Court notes that Plaintiffs apparently abandoned the May, 1987, date in their later submissions to the Court. *See, e.g.,* D.I. 42 at 9 (stating that the "racketeering activity commenced in or about October 1987" when the RICO Defendants engaged the services of Defendant WCIRA). The May, 1987, date was presumably based upon Defendant Leo Renzette "constantly advocat[ing] a 30% wage reduction under the Contracts and elimination of the Health & Welfare and Pension benefits under the Contracts." D.I. 4 at 25. While this allegation demonstrates that at least one of the Defendants was contemplating wage and benefit reductions, the Court is somewhat pressed to reasonably infer that racketeering activity had yet occurred. Nonetheless, given the procedural posture of the case before it, the Court will assume for the purposes of this motion that the alleged racketeering activity began in May of 1987.

activity did not satisfy the pattern requirement. *Hindes*, 740 F.Supp. at 336. Similarly, the Third Circuit in *Fiorentino v. Converse*, No. 89–1169, slip op. at 4 (3rd Cir. July 21, 1989), *Kehr Packages*, 926 F.2d at 1417–18, and *Marshall–Silver II*, 894 F.2d at 597, have held that closed-ended periods of "one-year", "eight months" and "less than seven months" respectively, are not considered long-term criminal conduct.

Based on the preceding cases, this Court concludes that an eleven to fourteen month closed-ended period of criminal activity is simply not substantial enough to constitute long-term criminal activity. *See also Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F.Supp. 579 (S.D.N.Y.1989) (thirteen months is not sufficient); *Fry v. General Motors Corp.*, 728 F.Supp. 455 (E.D. Mich.1989) (closed-ended period of nineteen months is insufficient); *Banks v. Wolk*, No. 89–7219, slip op., Broderick, J., 1989 WL 153936 (E.D.Pa. Dec. 15, 1989) (six months does not satisfy continuity requirement). Consequently, Defendants' motion to dismiss on the grounds that Plaintiffs have failed to allege a proper pattern of RICO racketeering activity is also granted.

### 2. *Embezzlement*

In paragraph 49 of the amended complaint, Plaintiffs allege that Defendants WCIRA and the Tiganis, on two or more occasions, knowingly induced and caused the Employers to refuse to make Pension and Health and Welfare contributions as required by the collective bargaining agreements. Plaintiffs contend that Defendants' conduct constitutes embezzlement within the meaning of 18 U.S.C. § 664 and thus are "predicate acts" of racketeering activity as defined in Section 1961(1) of RICO.[11]

■ The elements of a Section 664 embezzlement claim include: (1) the unauthorized; (2) taking or appropriation; (3) of union benefit plan funds; (4) with specific criminal intent. *United States v. Andreen*, 628 F.2d 1236, 1240–41 (9th Cir.1980). In order to have specific criminal intent, "the criminal act must have been willful, which means an act done with a fraudulent intent or bad purpose or an evil motive." *Andreen*, 628 F.2d at 1241; *Ris v. Bedell*, 699 F.Supp. 429, 436 (S.D.N.Y.1988). *See also Delgado–Chavez v. I.N.S.*, 765 F.2d 868, 869 (9th Cir.1985).

■ While the Court is aware that Section 664 "goes beyond the traditional concepts of embezzlement", *Andreen*, 628 F.2d at 1241, the Court finds the specifics of Plaintiffs' rather novel theory of embezzlement somewhat troubling. In the amended complaint, the Plaintiffs describe the basis of their legal theory in the following manner:

> The contracts involved in the instant case create an obligation to contribute to various employee benefit funds upon the employees' performance of services. Upon performance of the services, the obligation to contribute immediately arises. Additionally, at the same time the obligation to contribute arises, the amounts owed immediately become fund assets. Hence, the failure to remit the contributions constitutes embezzlement squarely within the scope of § 664.

D.I. 42 at 19.

The Court notes, however, that the reported caselaw is silent as to whether the failure to remit monies to an employee benefit fund constitutes embezzlement. Rather, all of the relevant cases address the unauthorized theft, abstraction or conversion of assets already paid into the benefit fund. *See, e.g., U.S. v. Goodstein*, 883 F.2d 1362, 1372 (7th Cir.1989) (fiduciary of profit sharing fund illegally converted $180,000 of plan funds under Section 664, who used them to meet the demands of personal indebtedness and for other personal purposes); *United States v. Ford*, 632 F.2d 1354, 1367 (9th Cir.1980) (health

---

**11.** The embezzlement statute provides:
Any person who embezzles, steals, or unlawfully converts to his own use or to the use of another, any of the ... funds ... of any employee welfare benefit plan or employee pension benefit plan, or any fund connected therewith, shall be fined not more than $10,-000, or imprisoned not more than five years, or both.
18 U.S.C. § 664 (1982).

and welfare fund trustee violated Section 664 when he participated in a scheme to illegally pay himself $101,250 in pension payments out of union trust funds); *United States v. Santiago*, 528 F.2d 1130, 1133 (2nd Cir.1976) (administrator and trustee of union welfare fund violated Section 664 when he diverted union funds for personal and general union use). Accordingly, the linchpin of Plaintiffs' legal analysis is the proposition that unpaid employer contributions to an employee benefit fund constitute assets of that fund not only when those contributions are paid into the fund but also at the moment when the contributions are due and owing.

In *Galgay v. Gangloff*, 677 F.Supp. 295 (M.D.Pa.1987), the court confronted an analogous situation where defendants had failed to contribute to an employee benefit fund in accordance with a collective bargaining agreement. The plaintiffs alleged that because the unpaid contributions were assets of the fund, the defendants were fiduciaries of that fund who had breached their fiduciary duties. *Id.* at 300–01. The plaintiffs grounded their argument upon statutory language in ERISA which provides that "a person is a fiduciary with respect to plan to the extent (i) he exercises ... any authority or control respecting management or disposition of its assets...." 29 U.S.C. § 1002(21)(A). The plaintiffs reasoned that because the defendants retained for their own benefit contributions owed to the fund, the defendants failed to act "solely in the interest of the participants and beneficiaries" thus breaching their fiduciary duties to the fund. *Galgay*, 677 F.Supp. at 301; 29 U.S.C. § 1004.

The *Galgay* court noted that the primary issue with respect to the plaintiffs' allegations was whether employer contributions purportedly owed to the benefit fund constituted assets under the circumstances alleged. Finding the statute and the scant caselaw to be of no assistance, the court turned to the language of the collective bargaining agreement. *Galgay*, 677 F.Supp. at 301. The wage agreement, to which all the defendants were allegedly either directly or indirectly a party, provided "Title to all the monies paid into and/or *due and owing* said fund shall be *vested* in and remain exclusively in the trustees of the fund...." *Id.* (emphasis added). Finding the unambiguous language of the wage agreement critical, the *Galgay* court held that by virtue of the wage agreement any delinquent employer contribution became a vested asset of the employee benefit fund when it was due and owing. *Id.*

In the instant case, the Court must also turn to the express language of the collective bargaining agreement as it is unable to find assistance in the embezzlement statute or the relevant caselaw. Article 48, the provision which governs the terms of the Employer's contributions to the employee pension fund, makes no reference as to when monies paid into the fund vest. D.I. 4, Exhibit A.[12] The provision merely states that the "Employer shall contribute into the Pension Fund" and that failure to contribute as specified shall render the employer liable for "all arrears in payment" as well as attorney fees, court costs, other damages and ten percent in liquidated damages. *Id.*

The above language leads the Court to believe that the delinquent contributions are to be treated as a debt owed to the benefit fund and not as a vested asset. Accordingly, the Court cannot find that Defendants, by allegedly inducing the Employers not to pay the purported delinquent contributions, embezzled those contributions within the meaning of Section 664. *See also United Indepen. Flight Officers v. United Air Lines*, 756 F.2d 1274, 1280 (7th Cir.1985) (United Airline's agreement to adopt pension improvements representing 70 million dollars in unfunded liability is not a plan asset); *Sutton v. Weirton Steel Div. of Nat. Steel Corp.*, 724 F.2d 406, 411 (4th Cir.1983) (corporation's contingent liability to union fund in the event of a shutdown was not an asset of that fund).

---

**12.** Article 47, which governs the Employers' obligations to contribute to the employees' Health and Welafare and Life Insurance Funds, con- tains identical language to that of the Pension fund provision. D.I. 4, Exhibit A.

While the Court does not want to be understood as endorsing a general rule that unpaid contributions may never constitute a benefit fund asset, the unusual circumstances in the instant case counsel against extending the reach of Section 664 in the manner urged by the Plaintiffs. Otherwise any time one party to a contract failed to remit monies or property in accordance with the terms of that contract, they could be held liable for embezzlement or conversion and, in the case of union funds, be subjected to RICO's harsh sanctions. Accordingly, the portions of Counts I and II which allege that Defendants violated 18 U.S.C. § 664 are dismissed.

Because the Court has dismissed both of Plaintiff's RICO counts, it is unnecessary to address Defendants' remaining grounds for dismissal, including Defendants' arguments that Plaintiffs are collaterally estopped from relitigating the issues previously dismissed by the ALJ and that this Court lacks subject matter jurisdiction due to the exclusive jurisdiction of the NLRB. The Court will also forgo analysis of the NLRB's contention that eight of the allegations in Plaintiffs' amended complaint are based exclusively on the protections afforded employees under Section 7 of the NLRA, 29 U.S.C. § 157, and that those allegations are preempted and not properly part of a RICO suit.

C. *Tortious Interference with Contract*

■ Counts III and IV of the amended complaint allege that the Employers, the Tiganis, and WCIRA tortiously interfered with Union contract rights and benefits of the Union and conspired to do the same. A claim for tortious interference with a collective bargaining agreement arises under federal common law of labor contracts and falls within the Court's jurisdiction under Section 301. *Intern. Broth. of Boilermakers v. Local Lodge D504*, 866 F.2d 641, 647 (3d Cir.1989); *Wilkes–Barre Pub. Co. v.*

*Newspaper Guild*, 647 F.2d 372, 381 (3rd Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982); *Larry v. Penn Truck Aids, Inc.*, 567 F.Supp. 1410, 1416 (E.D.Pa.1983).[13] In the absence of binding federal precedent, "state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate federal policy." *Wilkes–Barre Publishing Co.*, 647 F.2d at 381 (quoting *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957)). The Court also notes that because "[a]ny state law applied, however, will be absorbed as federal law and will not be an independent source of private rights", Plaintiffs' state law claims for tortious interference of contract are therefore preempted. *Wilkes–Barre Publishing Co.*, 647 F.2d at 381.

■ Under Delaware law, the elements of intentional interference with a contract are: (1) a contract; (2) about which defendants knew; (3) an intentional act that is a significant factor in causing the breach of such contract; (4) without justification; and (5) which causes injury. *Irwin & Leighton v. W.M. Anderson Co.*, Del.Ch., 532 A.2d 983, 992 (1987); *Restatement (Second) of Torts*, § 766 (1977). Assuming, without deciding, that the collective bargaining agreements were in effect and Defendants knowingly induced the breach of those agreements causing injury to the Plaintiffs, it must be noted that under well established principles of Delaware law, a party to a contract cannot tortiously interfere with that very same contract. *Gilbert v. El Paso Co.*, Del.Ch., 490 A.2d 1050, 1058 (1984). Accordingly, Defendants' motion to dismiss Counts III and IV against the Employers is granted.

■ Although no Delaware court has reached the issue of whether corporate officers and agents are also conditionally justified in advising the corporation to breach

---

**13.** Section 301(a) of the LMRA provides, in a relevant part:

Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district

court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

a contract, the prevailing view under state law is that "employees acting within the scope of their employment are identified with the defendant himself so that they may ordinarily advise the defendant to breach his own contract without themselves incurring liability in tort." Prosser, Law of Torts § 129 at 990 n. 25 (5th ed. 1984 & supp. 1990), text and annotations. *See also Michelson v. Exxon Research and Engineering Co.*, 808 F.2d 1005, 1008 (3rd Cir.1987) (applying Pennsylvania law); *Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321, 327 (9th Cir.1987) (applying California law); *Santucci Const. Co. v. Baxter & Woodman, Inc.*, 151 Ill.App.3d 547, 104 Ill.Dec. 474, 502 N.E.2d 1134, 1139 (2 Dist. 1986); *Stack v. Marcum*, 147 Mich.App. 756, 382 N.W.2d 743, 744 (1985); *Dehnert v. Arrow Sprinklers, Inc.*, 705 P.2d 846, 850 (Wyo.1985); *Trimble v. City and County of Denver*, 697 P.2d 716 (Colo. 1985), and cases cited.

Under Delaware law, the right of the contracting party to breach a contract is partially based on the rationale that "there is no legal 'wrong' in exercising the indisputable legal *power* to fail or refuse to perform a contract, as that act simply converts the promisee's rights from a right to performance to a right to collect damages." *Irwin & Leighton*, 532 A.2d at 993 n. 4 (emphasis in original) (citing *Philadelphia Storage Battery Co. v. Radio Corporation*, Del.Ch., 194 A. 414, 429 (1937)). It follows then that it is also not "wrong" for a manager or agent to attempt to protect the interests of the corporation by "counseling the breach of a contract with a third party which he reasonably believes to be harmful to his employer's best interests." *Los Angeles Airways*, 687 F.2d at 327. This rationale is particularly compelling when applied to corporate officers as "their freedom of action directed toward corporate purposes should not be curtailed by a fear of personal liability." *Steranko v. Inforex, Inc.*, 5 Mass.App.Ct. 253, 362 N.E.2d 222, 235 (1977).

In a well-reasoned opinion, the United States District Court for the Eastern District of Pennsylvania stated the rationale in the following manner:

The aggrieved party already has a claim against the corporate principal for breaching the collective bargaining agreement. Where the individual agent of the corporation is acting in the best interest of his principal, nothing is gained by recognizing, in addition, a cause of action against the individual for inducing the breach. Recognition of this sort of claim, on the other hand, transforms every simple breach of contract action into a claim for tortious interference, with its attendant claim for punitive damages. More importantly, it creates a needless interference with the individual's exercise of judgment on behalf of his corporate principal.

*Larry v. Penn Truck Aids, Inc.*, 567 F.Supp. at 1416.

An example of a corporate manager not acting in the best interest of the corporation is where the corporate officer induces the breach "in the hopes that he himself might fill the resultant economic void." *Los Angeles Airways*, 687 F.2d at 327. The Court finds the reasoning of this court and the others cited herein persuasive and believes that if the Delaware Courts were presented with this issue they would follow the prevailing view. In the present action, Plaintiffs have failed to set forth any allegations that the Tiganis acted outside the scope of their employment or sought to usurp any corporate opportunities. Consequently, Plaintiffs have failed to state a claim against the Tiganis based on their alleged interference with the collective bargaining agreements. Defendants' motion to dismiss Counts III and IV against the Tiganis is granted.

██ The remaining Defendant is WCIRA, a California corporation hired by the Employers and the Tiganis to aid in the alleged plan to rid the Employers of the Union and act as the Employers bargaining representative. WCIRA's role in the alleged breach of the collective bargaining agreements raises difficult questions regarding the liability of independent contractors who advise their principals to breach a contract. While the case law concerning this issue is more limited than that

regarding corporate officers and employees, the guiding principles remain the same. If the independent contractor's intent is to benefit the principal, then the alleged tortious conduct would fall within the conditional justification afforded the principal. If on the other hand, the independent contractor counsels breach based on his own personal enmities or to "further his own economic advantage at the expense of the other", then protection should be lacking. *Olivet v. Frischling*, 104 Cal. App.3d 831, 840–41, 164 Cal.Rptr. 87 (Cal. App.1980) (quoting *Imperial Ice Co. v. Rossier*, 112 P.2d 631 (1941)).

States which have dealt with the issue, such as California, recognize that hired third parties such as attorneys and architects will sometimes counsel interfering with a business relationship if the circumstances warrant it. The policy of extending the Employer's justification to breach is "designed to further certain societal interests by fostering uninhibited advice by agents to their principals. The goal of the privilege is promoted by protecting advice that is motivated, even in part, by a good faith intent to benefit the principal's interest." *Los Angeles Airways*, 687 F.2d at 328. This policy goal would be frustrated if, instead of advising a principal to engage in a privileged course of conduct, the independent contractor was forced to remain silent or risk liability to the disaffected party. As with Plaintiff's assertions concerning the Tiganis, Plaintiffs have failed to make any allegations that WCIRA acted other than in the Employer's best interests. Accordingly, Defendants' motion to dismiss Counts III and IV against WCIRA is granted.

### III. CONCLUSION

Defendants' motions to dismiss are granted. Counts I through IV of Plaintiffs' complaint and amended complaint are hereby dismissed. Any state law claims that survive this decision are dismissed without prejudice so that Plaintiffs may refile them in a state court action.